513 So.2d 958 (1987)
Kerri M. MARTIN, Ricky J. Martin, and April Kelli Hazelrig
v.
Richard P. WATTS and Huntsville Jaycees, Inc.
84-1007.
Supreme Court of Alabama.
April 10, 1987.
Rehearing Denied May 8, 1987.
Charles C. King and Charles A. Sullins, Huntsville, and Francis H. Hare, Jr., and D. Leon Ashford of Hare, Wynn, Newell & Newton, Birmingham, for appellants.
E. Cutter Hughes, Jr., and H. Harold Stephens of Lanier, Shaver & Herring, Huntsville, for appellee Richard P. Watts.
Don G. DeCoudres, Birmingham, for appellee Huntsville Jaycees, Inc.
PER CURIAM.
This is an appeal from a summary judgment made final pursuant to Rule 54(b), A.R.Civ.P. Defendants, Richard Watts, David Worley, and Huntsville Jaycees, Inc. ("Jaycees"), were alleged to have participated in sponsoring or to have assisted in sponsoring a party at which alcoholic beverages were provided to minors.
Two of the minors became intoxicated and caused an automobile accident in which plaintiffs were injured and another person was killed. The plaintiffs brought an action for damages against these defendants and others. Settlements have been reached with some of the original defendants, while others have been dismissed.
Defendants Watts and Jaycees filed motions to dismiss and motions for summary judgment. The lower court denied the motions to dismiss. In considering the motions for summary judgment, the trial court addressed two issues: First, whether an action for damages under the Alabama Dram Shop Act could be brought against either the Huntsville Jaycees or Watts, and second, whether an action founded upon common law negligence principles would lie against either defendant? Judge Smith, in a lengthy and scholarly order which traces *959 the history of legislation affecting alcoholic beverages in this state, held that an action will not lie on either theory and granted summary judgment for Watts and the Jaycees.

FACTS
The following facts are taken from Judge Smith's order.
The Huntsville Jaycees, Inc.
The Huntsville Jaycees, Inc., is a service organization created to benefit and improve the city of Huntsville. According to 11 World Book Encyclopedia 51 (1976),
"Jaycees are organizations that stress individual development through leadership training and civic involvement.... Jaycees learn to be leaders by working in community improvement programs. They sponsor programs on youth development, government affairs, health, safety, and international relations."
Included among the many community programs which the Huntsville Jaycees conducted was its sponsorship of the Huntsville High School Junior Jaycees.
The Huntsville High School Junior Jaycees
The Huntsville High School Junior Jaycees ("HHS Jr. Jaycees") is a high school service and social club. The members must be enrolled in Huntsville High School, have completed their sophomore year, and be at least sixteen years old. The following boys were officers of the HHS Jr. Jaycees during the 1981-82 school year: President: John Watts (son of defendant Richard Watts); Vice President: Drew Crow; Secretary: David Vest; and Treasurer: Wes Neighbors (son of William W. "Billy" Neighbors, Jr.). These boys were responsible for planning and preparing the party where the alcoholic beverages were consumed.
Mrs. Sandra Norton was the school faculty sponsor; however, she took no part in the affairs of the club. According to testimony, she was "just a name used by the club to comply with the stated school policy."
David Worley
David Worley is an attorney. He is associated with the Huntsville Jaycees, Inc., and served as "sponsor" for the HHS Jr. Jaycees chapter. In that capacity, he served as liaison between the two organizations and coordinator of their joint activities. To perform those duties, Worley attended meetings of both clubs.
Richard Watts
Richard Watts is the father of John Watts, the president of the HHS Jr. Jaycees. He and his wife, Jean Watts, are part owners of a lake cabin where this party was held.
The Party
Each year for a number of years, the HHS Jr. Jaycees had held "a big social event" for the club members and their invited friends. Thus, at one of the last club meetings during the 1980-81 school year, the members discussed party plans. Someone suggested a place where the beer might be purchased, but Worley, who was present, stated that he could get the club "a special deal." According to deposition testimony of Wes Neighbors,
"[Worley] said we could get it for nine dollars a case, so we decided on thirty cases of beer."
On Friday, May 15, 1981, following the end of classes for the day, Neighbors drove with David Vest to the law office of Worley with a check drawn on the "Huntsville High School Imprest Account" and made payable to Wes Neighbors. Neighbors endorsed the check and gave it to Worley. He and David Vest then followed Worley to Turner Beverage Company. Worley also endorsed the check, and handed it to Tully Turner, owner of the beverage company. Half-cases of beer were loaded by the boys and employees of the beverage company into the trunks of Vest's and Worley's automobiles. Next, they proceeded to the residence of Worley, where they stored the beer on Worley's back porch.
The following morning, Saturday, May 16, 1981, Neighbors and Vest returned to Worley's home. They loaded the beer into a pick-up truck and covered it with tarpaulins. *960 After meeting fellow club members John Watts and George Mahoney, they transported the beer from Huntsville to the cabin on Guntersville Lake in Marshall County.
When the four boys arrived at the Watts cabin, around noon, they iced the beer down in six coolers. John Watts had obtained these coolers from a building owned by the Jaycees.[1] Soon other HHS Jr. Jaycees and their guests began to arrive. During the early part of the afternoon, there was little or no control over access to the beer. Anyone could walk up to the coolers and help himself to as much as he desired. According to Neighbors, just about everybody who attended the party "was pretty much intoxicated." He described the party as "wild, a melee." Four young people passed out totally and had to be placed on beds in the Watts cabin. Many more were not capable of safely operating a motor vehicle.
Adults present during the party were: Billy Neighbors, the father of Wes Neighbors; Richard Watts, owner of the cabin and father of club president John Watts; and David Worley, who attended the party in his capacity as club "sponsor." Around 3:30 p.m., Billy Neighbors decided that things were getting out of hand; he and Richard Watts called a halt to the party. Richard Watts told the boys to load the beer back into the pick-up truck. Warren Bradford, age 18, was one of the boys who became intoxicated. Billy Neighbors told John Watts to remove the ignition keys from Bradford's vehicle. The keys were given to Bradford's companion, Mark Pullen, age 17. Pullen was told that he was to drive the vehicle back to Huntsville.
Pullen and Bradford left around 4 or 4:30 p.m., with Pullen driving. After they left, Bradford demanded forcefully that Pullen let him drive the car. Pullen stopped the vehicle and the boys changed positions.
Just after they had crested Monte Sano Mountain, and were on their way down into the city proper, "moving to the [beat of the] music" playing on the car's stereo, laughing, and "in a good mood," Bradford lost control of the vehicle. It skidded across his two lanes, across a wide, grassy median separating the lanes of traffic, and into the path of plaintiffs' on-coming vehicle.
Neither Pullen nor Bradford was injured very badly. However, the driver of the other car, Georgia L. Hazelrig, was killed. Her two daughters, Kerri Martin and April Hazelrig, were gravely injured.

DISCUSSION
Appellants argue that the appellees should be amenable to suit because appellees created and controlled a dangerous and foreseeable risk of harm. They contend that Judge Smith erred in holding as a matter of law that there was no cause of action which would lie against these defendants for their part in promoting a party at which alcoholic beverages were served to minors.
The essential element underpinning Judge Smith's order is an assumption that there can be no right of action against a noncommercial supplier of alcoholic beverages. Appellees go one step further and argue that to hold otherwise would amount to a social host liability. At the outset, a very important distinction should be made. The facts of this case do not require us to consider social host liability. Here we are concerned only with the providing of alcoholic beverages by adults to minor school children, which is a clear violation of law.

DRAM SHOP ACTION
Appellants contend that they should have been allowed to proceed under Code 1975, ง 6-5-71(a), Alabama's Dram Shop Act. Appellees contend that this section does not pertain to dispensing outside of the commercial setting.
The relevant portion of the Dram Shop Act provides:

*961 "Every wife, child, parent or other person who shall be injured in person, property or means of support by an intoxicated person or in consequence of the intoxication of any person shall have a right of action against any person who shall by selling, giving or otherwise disposing of to another, contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person for all damages actually sustained, as well as exemplary damages."
Code 1975, ง 6-5-71(a). Whether an action will lie under this section depends upon a statutory construction of two of the operative terms of the Act. We must determine the effect of the phrases "selling, giving or otherwise disposing of" and "contrary to the provisions of law". Section (a) of the statute contains a compound subject, modified by a dependent clause, and a predicate, modified by a series of prepositional phrases and a dependent clause. Stripped of their modifiers the subject is "every wife, child, parent, or other person," and the predicate is "shall have a right of action." Thus it can be seen that the overall purpose of this sentence is to create a cause of action.
We are concerned here with the effect of the modifiers of the predicate. The right of action is granted "against any person who shall ... cause the intoxication" of the intoxicated person referred to in the dependent clause which modifies the subject. The language represented by the ellipsis in the preceeding quotation consists of a compound prepositional phrase. The gerunds "selling," "giving," and "disposing of" form the compound object of the preposition "by". These gerunds are modified by the phrases "to another" and "contrary to the provisions of law," and take the compound object "any liquors or beverages." By analyzing the sentence grammatically we are able to arrive at the cause of action which has been created. The gerundial phrases act as modifiers of the verb of the dependent clause in the predicate, "who shall ... cause intoxication." The effect of these modifiers is to identify who may be sued and under what circumstances. That is, the right of action is granted "against any person who shall ... cause the intoxication of [the] person [injuring the plaintiff]," (1) "by selling ... to another, contrary to the provisions of law, any liquors or beverages," (2) "by giving ... to another, contrary to the provisions of law, any liquors or beverages," or (3) "by otherwise disposing of to another, contrary to the provisions of law, any liquors or beverages."
Our responsibility is to apply the statute according to the intent of the legislature. In discerning the intent of the legislature the Court looks solely to the language of the act, unless it appears that the wording is ambiguous or leads to a result which the Legislature could not have intended. Alabama Industrial Bank v. State Ex rel. Avinger, 286 Ala. 59, 237 So.2d 108 (1970).
We note that the legislature, in describing the conduct which will trigger the application of ง 6-5-71, has employed words and phrases which have or suggest a general application: "any person who shall, by selling, giving or otherwise disposing of to another, contrary to the provisions of law." Had the legislature intended to limit the class of persons against whom an action could be brought, the draftsmen could certainly have employed words much better suited to an expression of such an intent. If it was the intention to create a right of action against only that narrowly defined class of persons, i.e., "commercial dispensers," the draftsmen could have incorporated that term into the act. Or, they could have stopped with the words "by selling." They did not do that. Instead, they included the terms "giving" and "otherwise disposing of." It is hard to imagine a phrase more expansive than "otherwise disposing of."
However, these gerunds are further modified by the phrase "contrary to the provisions of law." Appellees argue that this is evidence of a legislative purpose to regulate those in the business of selling alcoholic beverages. Here also, the choice of words is significant. Elsewhere in the Code, under Title 28, the legislature has enacted an elaborate scheme for regulating the manufacture, dispensing, and consumption *962 of alcoholic beverages. If the purpose was to tie the causes of action allowed under ง 6-5-71 to the legislature's regulation of the industry, that purpose could have been clearly expressed by a specific reference to the provisions under Title 28; the drafters could have provided "in violation of the regulations of Title 28." Such is not the case. Rather, we find the words "contrary to the provisions of law." Again, it is difficult to imagine a compilation of words suggesting a broader application.
Much attention has been devoted to a historical discussion of the Dram Shop Act. Section 6-5-71 is virtually a word-for-word codification of the language of ง 8 of the 1909 Act which first created the cause of action. Act No. 191, ง 8, 1909 Ala. Acts, p. 65. To determine whether the draftsmen of the 1909 Act intended to restrict its application to the commercial setting, we turn to the definitional section of that Act. Section 31 of the 1909 Act defines the term "otherwise dispose of":
"when employed in any warrant, process, affidavit, indictment, information or complaint, or in any bill in equity or other pleading in any judicial proceeding or in any judgment or decree [the term] shall include and be deemed to include barter, exchange, giving away, furnishing, or any manner of disposition by which said liquors and beverages may pass unlawfully from one person to another."
Id. at p. 96 (emphasis supplied).
It is important to observe that the 1909 Act, of which the civil remedy was but one small part, was a very broad enactment intended to "suppress the evils of intemperance," p. 63. A perusal of the entire Act, which spans 33 pages, reveals that much of the current law regulating alcoholic beverages may also be traced to the 1909 Act. The fact is, the Act of 1909, just like the current provisions affecting "dry counties," prohibits virtually all use of alcoholic beverages, without regard to their source. But see Code 1975, ง 28-4-200.
Appellees go beyond the specific wording of the statute in search of support for their position. They present three additional factors which they contend provide such support: (1) the fact that the section is listed under the heading "ARTICLE 6. ILLEGAL LIQUOR SALES"; (2) the fact of frequent reference by this Court in prior cases to ง 6-5-71 as the "Dram Shop Act"; and (3) that prior opinions of this Court imply that a commercial sale is a prerequisite to an action under ง 6-5-71. The latter two factors are readily dismissed. The specific question not having been before the court, the prior case law "implying" such an intent of the legislature provides no guidance and amounts to little more than dicta. Likewise, there is no precedential value in the past references by the Court to ง 6-5-71 as the "Dram Shop Act" when that limited question was not being considered. See Ward v. Rhodes, Hammonds & Beck, 511 So.2d 159 (Ala.1987) (Jones, J., concurring, n. 1) (stating that the label "Dram Shop Act" is a misnomer).
Appellees assert that the legislature's designation "ARTICLE SIX. ILLEGAL LIQUOR SALES" is evidence of an express intent of the legislature to regulate illegal liquor sales. Certainly, if the reader looked at nothing more, the designation would alert in the reader an expectation that Article Six deals with illegal liquor sales. But, appellees attach too much significance to the name given to Article Six. As has already been pointed out, Article Six comes under Chapter 5, "ACTIONS," of Title Six, "CIVIL PRACTICE." Its purpose is to provide a civil remedy for a civil wrong arising out of a violation of law. The designation given by the legislature does no more than alert the reader to the general subject matter covered by the provisions of the Article. See Alabama Constitution 1901, Art. IV, ง 45. The designation is not accorded greater dignity than the substantive provisions of the Article. It is to be read consistent with those provisions, not vice versa, and should not impute a meaning different from that provided by the language of the statute. Where most acquisitions of alcoholic beverages originate from a commercial transaction, *963 it would not be unreasonable to anticipate that most acts giving rise to a civil remedy under ง 6-5-71 would also originate from a commercial transaction. Nor would it be unusual for the draftsmen to reflect that fact by designating the Article "ILLEGAL LIQUOR SALES." We think that the legislature did no more than seize upon a label which would succinctly state the general nature of the causes of action covered under Article Six.
Section 6-5-71 creates a civil remedy against persons who, contrary to law, cause the intoxication of another by providing the other person with alcoholic beverages, when the plaintiff is injured because of the intoxication. The term which most narrowly limits this cause of action is the requirement that the providing of the alcoholic beverages be contrary to law.
The legislature has prohibited all use of alcoholic beverages by minors. Code 1975, ง 28-3A-25(a)(19). Pullen and Bradford were both minors when the lake party was held. See Code 1975, ง 28-3A-2(18); cf. Acts 1986, No. 86-212, ง 2, effective April 1, 1986. It was the clearly stated intent of the legislature that these minors not have access to alcoholic beverages. It has long been recognized that "The sale or furnishing of prohibited alcoholic beverages to a minor is ... unlawful whether made by a licensee in a wet county, or by a nonlicensee in any territory in this State." Phillips v. Derrick, 36 Ala.App. 244, 54 So.2d 320 (1951).
The trend in recent decisions of other jurisdictions is to allow causes of action where adults have assisted in furnishing alcoholic beverages to minors. See the appendix to this opinion.
There are no facts to support an allegation that Watts provided any of the alcoholic beverages consumed by the minors. One of the elements of the cause of action under the Dram Shop Act is that the defendant provide alcoholic beverages to the intoxicated person who caused the injury to the plaintiff. Appellee Watts states in his brief that his only connection to the HHS Jr. Jaycees lake party was his ownership interest in the cabin and his presence during the party; that he took no part in providing the minors with alcoholic beverages. This has not been contested by Appellants in their brief. Therefore, summary judgment was properly granted for Watts.

COMMON LAW NEGLIGENCE
We hold that a common law cause of action does not lie in this case, notwithstanding the case of Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala.1984). See Ward v. Rhodes, Hammonds, & Beck, Inc., 511 So.2d 159 (Ala.1987).
Therefore, the judgment for Watts is affirmed. The judgment for Huntsville Jaycees, Inc., is reversed, and the cause is remanded for trial.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY and STEAGALL, JJ., concur.
HOUSTON, J., concurs in the result insofar as it affirms the summary judgment for defendant Watts, and insofar as it holds there is no liability under common law negligence, but otherwise dissents.

APPENDIX

Cause of Action Allowed
Fassett v. Delta Kappa Epsilon, 807 F.2d 1150 (3d Cir.1986). (Applying Pennsylvania law, Court of Appeals held that questions of material fact existed as to whether persons helped organize party for purposes of serving alcoholic beverages to minors, and whether they provided substantial assistance to minor in his consumption of alcoholic beverage, thus precluding summary judgment.)
Sutter v. Hutchings, 254 Ga. 194, 327 S.E.2d 716 (1985). (Analogizing to the rule that an owner of an automobile is liable when he entrusts it to an intoxicated individual, the court held that a person who encouraged an intoxicated minor to have *964 more drinks, knowing the minor would be driving an automobile, could be liable to a third person injured by the negligence of the intoxicated minor.)
Brattain v. Herron, 159 Ind.App. 663, 309 N.E.2d 150 (1974). (Violation of statute providing "No alcoholic beverages shall be sold, bartered, exchanged, given, provided or furnished, to any person [under age]" is negligence per se. Cause of action existed where adult acquiesced in minors' helping themselves to liquor from her refrigerator.)
Williams v. Klemsrud, 197 N.W.2d 614 (Iowa 1972). (Court found right of action under Dram Shop Act, against person "not engaged in liquor traffic" for having provided liquor to minor.) See also, Lewis v. State, 256 N.W.2d 181 (Iowa 1977).
Longstreth v. Gensel, 423 Mich. 675, 377 N.W.2d 804 (1985). (Violation of sections of liquor statute prohibiting furnishing of liquor to minor gave rise to action in favor of minor who was served and later injured himself.)
Reinert v. Dolezel, 147 Mich.App. 149, 383 N.W.2d 148 (1985). (Cause of action lies against defendants who furnished alcoholic beverages to persons under the legal drinking age.)
Lover v. Sampson, 44 Mich.App. 173, 205 N.W.2d 69 (1972). (Though the Dram Shop Act applied only to commercial vendors, nevertheless an action can be brought by an injured party against a non-commercial supplier who provides alcoholic beverages to a minor.)
Ross v. Ross, 294 Minn. 115, 200 N.W.2d 149 (1972). (Court found liability against individuals who purchased liquor for 19-year-old and held that Dram Shop Act, though never before applied in a non-commercial setting, imposed liability on all violations.)
Linn v. Rand, 140 N.J.Super. 212, 356 A.2d 15 (1976). (Without reference to any statute, Court held that furnishing of alcoholic beverages to minors in a social setting may give rise to a suit for injuries to third parties.)
Walker v. Key, 101 N.M. 631, 686 P.2d 973 (Ct.App.1984). (Violation of statute prohibiting dispensing of alcoholic beverages to minors gave rise to action by third parties injured by intoxicated minor.)
Huyler v. Rose, 88 App.Div. 755, 451 N.Y. S.2d 478 (1982). (Court found no cause of action under Dram Shop Act, but a common law duty to control the conduct of minor who was intoxicated, argumentative, and combative.)
Wiener v. Gamma Phi Chapter of Alpha Tau Omega Fraternity, 258 Or. 632, 485 P.2d 18 (1971). (Cause of action lies against fraternity that hosted party and served alcoholic beverages to minors and knew, or should have known, that minors were being served.)
Congini v. Portersville Valve Co., 504 Pa. 157, 470 A.2d 515 (1983). (Though court held in companion case that ordinarily there exists no liability on the part of a social host, an action does lie where the server provides alcohol to a minor.)
Douglas v. Schwenk, 330 Pa.Super. 392, 479 A.2d 608 (1984). (Following Congini, court held that "Defendants were more than mere social hosts furnishing liquor, they were knowledgeable persons providing alcohol to a minor....")
Koback v. Crook, 123 Wis.2d 259, 366 N.W.2d 857 (1985). (In action against hosts of high school graduation party, it was negligence per se to furnish liquor to a minor.)

No Cause of Action
United Services Automobile Ass'n v. Butler, 359 So.2d 498 (Fla.Dist.Ct.App.1978). (Deferring to the State legislature, the Court noted that historically there has not been a common law action against the dispenser and that Florida has no Dram Shop Act.)
Cory v. Shierloh, 29 Cal.3d 430, 174 Cal. Rptr. 500, 629 P.2d 8 (1981). (California statute explicitly bars suit against all dispensers.)
Holmquist v. Miller, 367 N.W.2d 468 (Minn.1985). (Civil Damage Act preempts a cause of action against non-commercial *965 dispenser, whether recipient was an adult or a minor.)
Runge v. Watts, 180 Mont. 91, 589 P.2d 145 (1979). (Citing public policy grounds, the court distinguished between the justifications supporting imposition of liability on the commercial vendor and on the non-commercial dispenser and held that the justifications were not sufficient to warrant extension of liability to the non-commercial vendor. Overruled in Nehring v. LaCounte, 712 P.2d 1329 (Mont.1986) (not involving a minor or a non-commercial dispenser), insofar as Runge holds that "the drinking of the intoxicating beverage, not the furnishing thereof, is the proximate cause of any subsequent injury.")

ON APPLICATION FOR REHEARING
HOUSTON, Justice (concurring in part and dissenting in part).
I withdraw my original opinion (concurring in part and dissenting in part, issued May 1, 1987) and in its place substitute the following:
Dram Shop Act actions brought under ง 6-5-71(a), Code 1975, are recognized in Alabama against licensed vendors and purveyors of alcoholic beverages. Certainly there was a scintilla of evidence that Turner Beverage sold beer to minors who were members of the Junior Jaycees; that Turner Beverage accepted a check drawn on the Huntsville High School Imprest Account for this beer; that the check contained the notation "For Jr. JC'sโLake Party Expenses"; and that the beer was removed from Turner Beverage's warehouse by these minors and Turner's employees. Turner Beverage was a licensed vendor and purveyor of alcoholic beverages. Clearly, an action under the Alabama Dram Shop Act against Turner Beverage would have withstood a motion for summary judgment. Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala.1984). However, that is not the case before this Court. Here the plaintiffs sought to extend the Dram Shop Act to reach the Huntsville Jaycees, Inc., a service organization, which is neither a licensed vendor nor purveyor of alcoholic beverages, and as such in my opinion had no liability under the Alabama Dram Shop Act. The majority opinion permits this.
The majority opinion extends the Alabama Dram Shop Act to social hosts if minors are involved. The Jaycees neither sold nor gave the beer to the minors. In some way, without any evidence of authorization or ratification that I can find in the record, an honorary member, not an active dues paying member served as sponsor of the Junior Jaycees and otherwise disposed of beer to minors by assisting the minors to purchase the beer. How an illegal act of an honorary member of a service organization which is not authorized or ratified becomes the act of the service organization is not addressed by the majority opinion.
I am persuaded that Judge Lynwood Smith's "Memorandum of Opinion and Order on Motions for Summary Judgment" is correct and should be affirmed. Judge Smith presented, in complete and masterful fashion, the reasons for his decision. To the extent that I dissent, I adopt Judge Smith's opinion as my own. It is as follows (omitting citations to the relevant pages of the trial record):

"MEMORANDUM OF OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT
"These consolidated actions are before the Court on the motions for summary judgment filed by defendants Huntsville Jaycees, Inc., and Richard P. Watts. Upon consideration of the pleadings, affidavits, depositions, and briefs of counsel, the Court renders the following memorandum of opinion and order.

"I. SUMMARY OF FACTS RELEVANT TO THE ISSUES PRESENTED
"On May 16, 1981, the Huntsville High School Junior Jaycees club hosted a party at the lake cabin of defendant Richard P. Watts. The cabin is situated on Guntersville Lake in Marshall County, Alabama, a `dry county.' All but a handful of the persons who attended the party were minors. Nonetheless, a large quantity of iced *966 beer was freely available to all who desired to consume it. The beer had been purchased for the Junior Jaycees by an adult, defendant David E. Worley, with funds provided him by the Junior Jaycees club. David E. Worley was a non-voting, semi-retired, `honorary member' of defendant Huntsville Jaycees, Inc., but he had been approved by that organization as `sponsor' of (or liaison to) the Huntsville High School Junior Jaycees club. Mr. Worley was present at the lake party for a portion of the afternoon it was held, but he personally made no effort to restrict the consumption of beer by the minors present. Moreover, even though defendant Richard P. Watts was present for all but thirty minutes of the party, he also made no effort to restrict the consumption of beer until it became obvious that matters were getting out of hand. As subsequent events proved, however, it was by then too late. One of the young persons present, who had consumed beer to the point of intoxication (former defendant Warren Lee Bradford) was involved in an automobile collision while driving back to Huntsville. The driver of the vehicle he struck was killed, and her two daughtes were seriously injured. Hence, these consolidated actions.

"II. THE ISSUES PRESENTED
"The motions raise a number of troublesome questions. In the main, however, there are two, overwhelming questions. One, does an action for damages under the Alabama dram shop act lie against either the organization that established and sponsored the Huntsville High School Junior Jaycees club, or the property owner who permitted the party to be held on his premises? Two, if not, does an action founded upon common law principles lie against either defendant?
"Surprisingly, neither question has been squarely answered by the appellate courts of this State. There is no decision on all fours. Consequently, close attention must be paid to those appellate decisions and other authorities which may be found, in order to glean a direction for reasoning. Hence the following detailed analysis of the facts and law applicable to these actions.

"III. FULL STATEMENT OF THE FACTS RELEVANT TO THE ISSUES PRESENTED
"A. THE HUNTSVILLE JAYCEES, INC.
"`The Huntsville Jaycees, Inc. is a service organization created to benefit and improve the City of Huntsville.' It is affiliated with a national organization founded in 1920, and then known as the `Junior Chamber of Commerce.' (The name was changed in 1965 to the `United States Jaycees.')
Jaycees are organizations that stress individual development through leadership training and civic involvement. * * Jaycees learn to be leaders by working in community improvement programs. They sponsor programs on youth development, government affairs, health, safety, and international relations.
11 World Book Encyclopedia 51 (1976). Jaycees believe, as a creed ...:
[That] faith in God gives meaning and purpose to human life. That the brotherhood of man transcends the sovereignty of nations. That ... economic justice can be best won by free men through free enterprise. That government should be of laws rather than of men.
"Ernest C. Kaufmann II was President of the Huntsville Jaycees, Inc., from June 1, 1980, through May 31, 1981. That year, the local Jaycees had `a minimum' of 300 members. The general membership met twice each month, as did the Board of Directors (but on dates different from the general membership meeting).
"The Huntsville Jaycees, Inc., conducted a number of community programs during 1980-1981. At least one of those programs (the Northeast Alabama State Fair) generated a large cash flow. Nonetheless, the `corporation' was loosely structured. Minutes of meetings were kept only on a `sporadic basis.' There was neither a central depository for, nor any member designated to preserve, corporate documents on a `permanent basis.' Rather, all organizational *967 records were `kept ... loose,' in the home or garage of the individual who was secretary during any particular organizational year.
"B. THE HUNTSVILLE HIGH SCHOOL JUNIOR JAYCEES
"The Huntsville High School Junior Jaycees (HHS Jr. Jaycees) is a high school service and social club. The members must be enrolled in Huntsville High School, have completed their sophomore year, and be at least sixteen years old. All general meetings of the club (with the exception of the year-end Awards Banquet and Lake Party) are held in Huntsville High classrooms. Election of new members to the club and of officers for the succeeding year, occurs near the end of each school year. Thus, in late April or early May of 1981 the following young men were elected officers of the HHS Jr. Jaycees for the forthcoming 1981-1982 school year:
"PRESIDENT: John Watts (son of Richard P. Watts);
"VICE-PRESIDENT: Drew Crow;
"SECRETARY: David Vest; and,
"TREASURER: Wes Neighbors (son of Wm. W. `Billy' Neighbors, Jr.). This new slate of officers was responsible for planning and preparing both the 1980-81 year-end Awards Banquet and [the] Lake Party.
"C. DISTINCTIONS BETWEEN THE TWO ORGANIZATIONS
"The defendant Jaycees did not control the day-to-day activities of the HHS Jr. Jaycees. There really is no question about that. Rather, as David Vest (Secretary of the HHS club) testified, the Junior Jaycees did not seek the `input' or `permission' of the Huntsville Jaycees, Inc., for every club activity. `It was our club to run as we saw fit in an orderly and respectful manner.' Thus, the HHS Jr. Jaycees engaged in school activities, and, conducted community service projectsโsuch as helping at `an old folks' home'โindependent of the defendant Jaycees.
"Moreover, the Huntsville Jaycees, Inc., did not provide any financial assistance to the HHS Jr. Jaycees. The high school organization was `self-sustaining.' Each school year, the club would raise its own funds by means of such things as `a talent... or gong show,' or firewood sale. The proceeds from those projects were deposited to the `Imprest Account' maintained by the administration of Huntsville High School, and drawn on as necessary to meet club expenses. The expenditures occasioned by the year-end Awards Banquet and Lake Party, for example, were paid by means of checks drawn on that account.
"Nonetheless, there were seven significant connections between the defendant Jaycees and the HHS Jr. Jaycees during 1980-1981. And it is those connections that now shall be discussed.
"D. CONNECTIONS BETWEEN THE ORGANIZATIONS
"First among such connections, of course, is ... the fact that both organizations share the name of `Jaycees.' The implications of that shared title are obvious, in spite of the many ways in which the defendant Jaycees have sought to disavow any relationship. Nevertheless, it is undisputed that the Huntsville Jaycees, Inc., `established' and `organized' the Junior Jaycee chapters in area high schools. [Testimony of Randy Morris.][1] Moreover, it is not disputed that the parent organization appointed individuals to `stay in touch with' the high school chapters for the purposes of coordinating common community activities (discussed infra), determining whether the junior clubs needed assistance from the senior club, and also ensuring that the high school chapters `keep [to] that purpose' for which they were established.
"Second, the HHS Jr. Jaycees assisted each year in the `March of Dimes Walkathon' *968 sponsored by the Huntsville Jaycees, Inc. In that activity, the Huntsville Jaycees solicit area elected officials, personalities, dignitaries, and other `residents [to] walk 15 miles and get money donated per mile' for the benefit of the March of Dimes. Members of the HHS Jr. Jaycees were stationed at each of the fifteen-mile checkpoints, and stamped each participant's card for verification of the distance walked.
"Third, the HHS Jr. Jaycees assisted every year in the conduct of the `Northeast Alabama State Fair' by:
picking up garbage, taking up tickets at the gates, patrolling the fences, helping park cars, directing traffic onto the parking areas. * * * Whatever ... needed to be done.
In other words, from Monday through Saturday night of each Fair week, the HHS Jr. Jaycees performed many of the same functions as members of the Huntsville Jaycees, Inc., `[w]ith the exception of handling money.'
"Fourth, each organizational year the Huntsville Jaycees, Inc., designated one general membership meeting as `Junior Jaycee Night.' The officers of Junior Jaycee chapters were invited to attend, and were recognized at that meeting.
"Fifth, in return for the assistance they rendered the parent Jaycee organization during the March of Dimes Walkathon and the Northeast Alabama State Fair,
the Huntsville High Junior Jaycees were allowed to use the Bonn Building on the fairgrounds to hold their annual banquet. Nothing other than the building was provided by us for their banquet. A request was made by them for us to let them use the building for a party, but this request was refused. ...
[Emphasis added by Judge Smith.][2]
"The sixth connection is an ironic one. The defendant Jaycees took credit for sponsoring and promoting the laudable community service projects of the HHS Jr. Jaycees. In award competitions among State and National Jaycee organizations, the defendant Jaycees, on at least three occasions, listed the HHS Jr. Jaycees program as an example of their youth development programs in this City. `We won a state award and a national award for the Huntsville High chapter.' David E. Worley contends that prior to 1980-81, he, personally, was given an award by the defendant Jaycees in his capacity as sponsor of the high school chapter, `for having one of the better projects, or the best project' during the year.
"The seventh, and possibly the most significant, connection is that David E. Worley served as `sponsor' for the HHS Jr. Jaycee chapter. In that capacity, he served as liaison between the two organizations, and coordinator of their joint activities. To perform those duties, Worley periodically attended meetings of both clubs.
"Of course, for summary judgment purposes the question of whether David E. Worley was the principal link in the chain connecting the defendant Jaycees to the high school chapter is a `material fact.' And in that regard, the defendant Jaycees have gingerly attempted to imply there is a `genuine issue' about that fact, without *969 flatly stating such.[3] But, in spite of the understandably cautious manner in which they approach the question, in the final analysis they do not deny that Worley was the club's sponsor.[4] Indeed, as the following summary of the evidence should make clear, they really can not deny that connection.
"(1) Worley, himself, asserts that he was the sponsor of the club, practically from its inception. While admitting that he had passed the age of 36 by the year 1981, and thus could no longer vote or hold elected office in the Huntsville Jaycees, Inc., Worley insisted that he continued to attend the meetings, and to participate in the activities of that organization as `an honorary member.' Furthermore, Worley asserts that, during the `first three or four years' of the club's existence, he was asked by either the President or the `external Vice-President' of the defendant Jaycees to serve as sponsor for the HHS Jr. Jaycees. But, `in the last couple, two, three years that I was [sponsor], it was at the request of the Junior Jaycees, and okayed by the Jaycees.' [Emphasis supplied by Judge Smith.]
"(2) All members of the HHS Jr. Jaycees who have been deposed state, unanimously, that David E. Worley was their sponsor.
"(3) Joe L. Anglin, Jr., the Principal of Huntsville High School, has stated that Worley was the club's sponsor.
The Huntsville Jaycees, Inc. ... sponsors a club at Huntsville High School called the Junior Jaycees. School policies require that the sponsoring organization furnish a sponsor for the club to assist in its functions and to coordinate the club's on-and-off campus activities. The clubs also have a school faculty member sponsor who assists the clubs in [their] school-related activities. The sponsor assigned to the Huntsville High Junior Jaycees by the Huntsville Jaycees, Inc. from the time the club was organized up through the 1980-81 school year was David E. Worley. Beginning with the 1981-82 school year the Huntsville Jaycees, Inc. replaced David E. Worley as the school club sponsor by designating John Zachary in place of Mr. Worley as the club sponsor. Mr. John Zachary was also the club sponsor for the 1982-83 school year.
It should be noted, at least in passing, that the `school faculty member sponsor,' to whom Mr. Anglin makes reference above, was Mrs. Sandra Norton during the 1980-81 school year. However, as the boys have testified: `She was just a name,' used by the club to comply with the stated school policy.
She didn't go to any of the meetings. She didn't do anything. Like when we needed something signed by our sponsor at school she would sign it and that was it.
"(4) Finally, counsel for defendant Huntsville Jaycees, Inc. stipulated during pre-trial conference that David E. Worley `was one of the sponsors of the Junior Jaycees.'
"Thus, when all of the evidence is summarized, the links in the organizational chain connecting the defendant Jaycees with the HHS Jr. Jaycees may be depicted *970 by the diagram shown [at a later point in this opinion.]
"E. PREPARATIONS FOR THE HHS JR. JAYCEES LAKE PARTY
"Each year for a number of years, the HHS Jr. Jaycees had held `a big social event' for club members and their invited friends. [The year] 1981 was no different. Thus, at one of the last club meetings during the 1980-1981 school year, the members discussed party plans. Someone suggested that beer be purchased `from Ragland's place,' but David E. Worley, who admits he was present, allegedly stated he could get the club `a special deal.'
He said we could get it for nine dollars a case, so we decided on thirty cases of beer, voted on thirty cases of beer, [and] that's the reason for the two hundred seventy dollar check.
"On Friday, May 15, 1981, Wes Neighbors obtained from `Mrs. Pukl' in the main office a check drawn on the `Huntsville High School Imprest Account' in the amount of $270, and drawn payable to the order of `Wes Neighbors.' The check shows that it was `FOR Jr. JC'sโLake Party Expenses.'
"Later that same afternoon, following the end of classes for the day,[5] Wes drove with David Vest to the law office of David E. Worley. Wes endorsed the back of the check and gave it to Worley. Wes and David Vest then followed Worley to Turner Beverage Company. They arrived late in the day, just as the business was closing. Worley also endorsed the back of the check, and handed it to `Tully' Turner, owner of the beverage company. Half-cases of Budweiser beer were loaded by the boys and employees of the beverage company into the trunks of Vest's and Worley's automobiles. That done, the boys followed Worley to his residence. The beer was stored on Worley's screened, back porch.[6] When unloading the beer, the two boys were surprised to learn they had purchased not 30 full cases, but 51.
"The following morning of Saturday, May 16, 1981, Wes Neighbors and David Vest returned to Worley's home. They loaded 31 to 35 cases of the beer into the bed of George Mahoney's black Ford pick-up truck, which they had borrowed for the purpose, and covered it with tarpaulins. Wes and David Vest, after meeting John Watts and George Mahoney at another location, then drove the beer from Huntsville to the cabin of Richard P. Watts on Guntersville Lake, in Marshall County.
"Richard P. Watts is the father of John Watts, the newly elected President of the HHS Jr. Jaycees. He and his wife, Jean Cummings Watts, own an undivided one-third interest in the lake home where this party was to be held. The other two-thirds interest is owned by Jean Watts' two sisters and their husbands. The cabin is situated in a `dry' county. But, Richard Watts was under the impression that it was permissibleโeven for minorsโto consume beer in a dry county, `if it was on private property.' Moreover, Richard Watts asserts that he was not asked, nor did he give his son permission, to hold the HHS Jr. Jaycee party at the cabin. Rather, he contends, his wife (and John's mother) was the one who gave permission, and he did not learn of the plans until two days before. In any event, the party was held at that cabin, and Richard P. Watts was present throughout most of the day.
"When the four boys arrived at the Watts cabin around noon, they iced the beer down in `long legged' metal Coca-Cola coolers. John Watts had, apparently surreptitiously, obtained those coolers from the Bonn Building at the Jaycees' fairgrounds. `I don't think they knew we had them ...' [said Wes Neighbors]. They then spread out barbecued pork and other edibles left over from the annual Awards *971 Banquet, held the previous week, and waited for everyone else to arrive.
"F. THE PARTY ITSELF
"And arrive they did. Estimates of the number who attended vary from a low of forty to a high of 110. During the early part of the afternoon, there was little or no control over access to the beer. Anyone could walk up to the coolers and help him or herself to as much as desired.
It was available to anybody that wanted it. At the first ... we were handing it out and I guess people got tired of handing it. We were going to take hours [i.e., shifts] at a time, [and] I had the first two hours to make sure nobody came up and took a whole bunch off ... in a boat or something, but after a while it was just out in the open and nobody was watching it.
[Wes Neighbors.] Consequently, things began to get out of hand, as Wes Neighbors later implied by his choice of the words `wild' and `melee' to describe the scene.
"According to Wes Neighbors, just about `everybody' who attended the party `was pretty much intoxicated, except for Mark Pullen and John [Watts]....' Four young people `passed out totally,' and had to be placed on beds in the Watts cabin. Many more were not capable of safely operating a motor vehicle. Warren Lee Bradford was among those.
"`Late in the morning, maybe ten-thirty, eleven' o'clock on May 16, 1981, Warren Lee Bradford (son of Dr. Ivan B. Bradford) called at the home of Dr. Joe R. Pullen for his son, Mark. The two boys then drove from the Pullen residence to Guntersville Lake in Dr. Ivan Bradford's 1978 International `Scout,' a four-wheel drive vehicle. Lee Bradford, the driver, was eighteen years old. His friend, Mark Pullen, was 17. They arrived at the Watts cabin around noon. From then until 3:30 that afternoon, the boys admittedly consumed some beer. Pullen said he drank four cans of Budweiser. Lee Bradford estimated he drank five or six cans, in conjunction with `three or more' barbecued pork sandwiches. Whatever the true facts may be, Lee Bradford became noticeably intoxicated. According to Wes Neighbors, Bradford's speech was slurred, he staggered, he kissed a girl that `wasn't his girlfriend,' and `he couldn't run a race.'
"Former [University of] Alabama All-American (and NFL All-Pro) football player Billy Neighbors also drove to the Watts cabin that afternoon. He went to check on his son, Wes, and arrived about 1:30. For a while he talked with Richard Watts and David E. Worley, who attended the party in his capacity of club `sponsor' and father of Jonnie Worley, the `Sweetheart' of the HHS Jr. Jaycees. By 3:30, however, Billy Neighbors decided that enough was enough. He and Richard Watts stopped the flow of beer. According to Wes Neighbors, his father `laid down the law.... [A]nd my dad got a lot of respect from everybody, to say the least.' Richard Watts told the boys to load the beer back into the bed of the pick-up truck. And Billy Neighbors told John Watts to remove the ignition keys from Warren Lee Bradford's Scout. The keys were given to Mark Pullen with instructions that he was to drive the vehicle back to Huntsville. Billy Neighbors told Bradford that he would `kick his tail' if he tried to drive home.
"The two boys followed those instructions, after a fashion. Pullen and Bradford remained at the cabin for possibly as much as another hour, drinking no more beer. They left `around four [or] four-thirty,' with Mark Pullen behind the wheel. At the point where U.S. Highway 431 changes from a two-lane to a four-lane roadway, however, Lee Bradford `demanded,' `forcefully,' that Pullen let him drive the car. Mark pulled onto the shoulder of the road, and the boys changed positions.
"The boys almost made it safely home. Just after they had crested Monte Sano Mountain, and were on their way down into the city proper, `moving to the [beat of the] music' playing on the car's stereo/radio, laughing, and `in a good mood,' Bradford lost control of the vehicle. It skidded across his two lanes, across a wide, grassy median separating the lanes of traffic, and *972 into the path of plaintiffs' oncoming vehicle.
"Neither Mark Pullen nor Lee Bradford was injured very badly. It was another story with the plaintiffs, however. The driver, Georgia L. Hazelrig, died. Her two daughters, Kerri M. Martin and April Kelli Hazelrig, were horribly injured.
"Warren Lee Bradford was subsequently indicted and prosecuted for manslaughter. He was convicted by a jury of criminally negligent homicide. And, of course, these civil actions were brought against those defendants listed in paragraph 1 of this Court's Order on Pre-Trial Hearing. Since then, however, a substantial out-of-court settlement was reached with certain defendants. And the claims against Warren Lee Bradford, Ivan B. Bradford, and Mark Edward Pullen have been dismissed, by stipulation, with prejudice. This Court also granted Billy Neighbors's motion for summary judgment. Which brings us, then, to the instant motions.
"G. HUNTSVILLE JAYCEES, INC. AND HHS JR. JAYCEES ORGANIZATIONAL DIAGRAM
*973 

"IV. DISCUSSION OF ISSUES PRESENTED
"A. DOES THE DRAM SHOP ACTION LIE?
"The Alabama legislature first enacted a dram shop act in 1909. It came into being as section 8 of Act Number 191, passed during the 1909 Special Session. It read as follows:
8. That every wife, child, parent or other person who shall be injured in person, or property or means of support by any intoxicated person, or in consequence of the intoxication of any person, shall have a right of action against any person who shall by selling, giving or otherwise disposing of to another contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person, for all damage actually sustained, as well as exemplary damages; upon the death of any party the action, or right of action will survive to or against his executor or *974 administrator. The party injured, or his legal representatives, may bring a joint or separate action against the person intoxicated, or who furnished the liquor; and all such suits shall be by civil action in any court having jurisdiction thereof.
1909 Acts of Alabama, Act No. 191, ง 8 at 65-66 (Aug. 25, 1909) (emphasis supplied).
"The troublesome phrase in the statute is emphasized: i.e., `selling, giving or otherwise disposing of....' (the same language now is found at Ala.Code, ง 6-5-71(a) (1975)). The moving defendants contend they did not sell, give, furnish, or otherwise dispose of the intoxicating beverages consumed by Warren Lee Bradford, or any other member of the HHS Jr. Jaycee Club. Plaintiffs contend the statutory language is un ambiguous, and clearly applicable to the facts of this controversy. These conflicting positions raise the question of what the Alabama Legislature intended when it employed the disputed language. Surprisingly, the answer to that question requires a more intensive inquiry into the history of our dram shop act than this Court initially surmised.
"1. The Historical Common Law Position
"At common law, no action to recover damages for injuries caused by intoxication could be brought against the person who furnished liquor to another, whether by sale, by gift, or by other means. The reason generally given for the common law rule was simple. The voluntary consumption (and not the dispensing) of liquor was deemed the proximate cause of injuries sustained as a result of intoxication. See, 45 Am.Jur.2d, Intoxicating Liquors งง 553, 554 (1969). `The rule was based on the obvious fact that one cannot be intoxicated by reason of liquor being furnished him if he does not drink it.' Nolan v. Morelli, 154 Conn. 432, 226 A.2d 383 (1967).
"The common law rule was enunciated in Alabama in King v. Henkie, 80 Ala. 505 (1876). Mrs. King, the widow of a man who died as a result of excessive consumption of alcohol, brought suit under the wrongful death statute against the owners of a Tuscumbia saloon. She alleged that her husband had stumbled into the bar one day `in a hopeless state of intoxication' and, while `in this condition of helplessness and mental darkness,' the proprietors ...
in violation of law, furnished, gave and sold to the plaintiff's intestate a large quantity of intoxicating liquors which he drank, and which caused the death of plaintiff's intestate before he left said saloon....
Id., at 506. The `violation of law' to which plaintiff referred in her complaint was a provision of the 1876 Code of Alabama which made it a misdemeanor to furnish any quantity of liquor to `persons of known intemperate habits except upon the requisition of a physician for medicinal purposes....' Id., at 508. In affirming the trial court's dismissal of the action, the Supreme Court said:
The death of the deceased was not `caused' so much by the wrongful act of the defendants in selling him whiskey, as by his own act in drinking it after being sold to him. The only wrongful act imputed to the defendants was the selling, or giving, as the case may be, of intoxicating liquors to the deceased while he was in a stupidly drunken condition, knowing that he was a man of intemperate habits. * * * The act ... was a statutory misdemeanor. But this was only the remote, not the proximate or intermediate, cause of the death of plaintiff's intestate. * * * Had it not been for the drinking of the liquor, after the sale, which was a secondary or intervening cause co-operating to produce the fatal result, and was the act of deceased, not of defendants, the sale itself would have proved entirely harmless. Hence it can not be said that the wrongful act of the defendants, in making sale of the liquor, caused the death of King; but rather his own act in drinking it.
King v. Henkie, supra, at 510.
"2. Remedial Legislation
"The common law rule expounded by such cases as King v. Henkie eventually was overthrown by legislative enactments *975 in a number of states.[7] But such remedial legislation was not generated as much by a legislative rejection of the courts' rationale,[8] as it was encouraged by both the temperance and prohibitionist movements.[9]
"Referred to as either `civil damage acts' or, more commonly, `dram shop acts,' such statutes create a cause of action against the suppliers of liquors under specified circumstances, and in favor of specified persons. The language of such statutes varies from state to state. See, generally, the authorities cited in note 7, supra. Consequently, each act must be closely studied to determine who is entitled to sue, who may be sued, under what circumstances suit may be brought, and for what damages. Generally speaking, however:
One thing that must be constantly borne in mind when considering such acts is that the right and remedy created by them are exclusive; no right of action exists except as expressly given by the statutes, and the remedy prescribed cannot be enlarged except by further legislative enactment.
45 Am.Jr.2d Intoxicating Liquors ง 561 (1969) (emphasis supplied). See also footnote 16, infra.
"In addition, there is one other principle upon which the authorities are generally consistent: liability under such dram shop acts extends only to those engaged in the business of manufacturing, distributing, or selling intoxicating liquors.
Although dram shop or civil damage acts usually provide for the recovery of damages from `any person' giving or selling intoxicating liquor, the general rule appears to be well established that such statutes were not intended to and do not create a right of action against one who gives another the beverage as a mere act of hospitality or social courtesy and without pecuniary gain, but instead provide a right of action only against those in the business of selling liquor.

Annot., 8 A.L.R.3d 1412, 1413 (1966) (emphasis supplied). An instructive case on this point is Miller v. Owens-Illinois Glass Co., 48 Ill.App.2d 412, 199 N.E.2d 300, 8 A.L.R.3d 1402 (App.Ct.1964).[10]
*976 "3. The Alabama Dram Shop Act: Its Judicial Interpretation
"Unfortunately, the appellate courts of Alabama have not squarely addressed the question of whether our dram shop act provides an action against persons (such as defendants herein) who are not engaged in the business of manufacturing, distributing, or selling liquor. Even so, the case of DeLoach v. Mayer Electric Supply Co., 378 So.2d 733 (Ala.1979), supports (at least inferentially) the argument that the question would be answered negatively.
"In DeLoach, defendant Mayer Electric hosted an `open house' and `New Products Show' on its premises. Food, soft drinks, and beer were gratuitously provided for consumption by those who attended. Mayer Electric's employees were among the invited guests. One such employee became intoxicated. After leaving the function, he drove his automobile onto the wrong side of Interstate 59, and into the motorcycle of a uniformed policeman. The policeman was seriously injured, and brought suit against both Mayer Electric and the business entity (Britling's) which had catered the function. Id., at 733-34. He contended the Alabama dram shop act applied because those defendants had `sold' liquor without being licensed to do so. See Ala. Code งง 28-3-260(10), 28-3-1(16) (1975). In an opinion affirming the trial court's entry of summary judgment in favor of defendants, the Supreme Court did not write expansively. Rather, in speaking for the Court, Mr. Justice Bloodworth said only that `there was no "sale" within the meaning of' the Code sections referred to above and, therefore, `the Dram Shop Act is not applicable.' Id., at 734-35.
"Admittedly, the DeLoach opinion is susceptible to conflicting interpretations. On one hand, it may be argued that the decision should be limited to its facts, and to its specific holding of no `sale,' because no compensation changed hands between the drunk and the supplier of the liquor. On the other hand, it also may be persuasively argued that DeLoach should be read more broadly, and as holding that the Alabama dram shop act normally does not apply in the absence of a sale (e.g., when the liquor is furnished gratuitously, in a social setting).
"In choosing between these conflicting interpretations, this Court is persuaded by the following authorities that the latter is the correct one.
"The broader holding suggested by DeLoach is supported by Phillips v. Derrick, 36 Ala.App. 244, 54 So.2d 320 (1951). In that case, the Alabama Court of Appeals stated that Alabama's dram shop act:
evidences a policy on the part of the law-making body to discourage the illegal sale of alcoholic beverages.
Id. at 246, 54 So.2d at 321 (emphasis supplied). The Phillips court emphasized the commercial focus of the Act by utilizing the words `sale,' `sell,' and `sold' no less than thirteen times in the course of two pages.
"In like manner, an early Supreme Court decision construing the dram shop act indicated that the action lay only against one in the businessโalbeit, the illegal business โof selling liquor. Thus, in Webb v. French, 228 Ala. 43, 152 So. 215 (1934), after first noting that the Act had come into existence as part of a sweeping `prohibition enforcement measure,' the Alabama Supreme Court held that the dram shop act:
creates a cause of action against the bootlegger (to use a modern term) for personal injuries to third persons at the *977 hands of one to whom the bootlegger has furnished prohibited liquor and the injury is the proximate consequence of intoxication from such liquor.
Id. at 44, 152 So. at 216 (emphasis supplied).
"Moreover, Alabama Pattern Jury InstructionsโCivil 36.92 begins with the following language: `Because public policy discourages [the] illegal sale of alcoholic beverages....' (Emphasis supplied.)
"Finally, the most recent pronouncement of our Supreme Court on the dram shop act contains this statement: `Alabama's dram shop statute creates a civil action against a purveyor of alcoholic beverages....' Buchanan v. Merger Enterprises, Inc., 463 So.2d 121, 122 (Ala.1984) (emphasis supplied). Webster's Third New International Dictionary (1971 unabridged ed.) defines `purveyor' as `one who provides victuals or whose business is to make provisions for the table,' at 1848 (emphasis supplied).
"However, the keys which unlock the statutory scope intended by the Alabama Legislature when it inserted the phrase `selling, giving or otherwise disposing of' into the dram shop act will not be found in the foregoing authorities. Rather, those interpretive keys are found in the history of the temperance and prohibitionist movements in Alabama, and in the statutory changes which those movements impressed upon public policy (of which the dram shop act is but one).
"4. The Alabama Dram Shop Act in Historical Context
"The question of liquor regulation pre-dates statehood. It was an important issue of government from the time settlers first moved into the region which eventually became the State of Alabama. `[E]ach colonial government ... found it necessary to devise ways and means of handling the problem of liquor control.' J.B. Sellers, The Prohibition Movement in Alabama 1702-1943, at 1 (1943) (hereinafter Sellers). From then until now, the questions of whether, and how, to control liquor have been persistent issues of our political history.
"But, the prohibition issue virtually dominated State politics during the first two decades of the twentieth century. The explanations for that political phenomenon are varied, and interesting.[11] Even so, an exploration of the socio-economic bases of the temperance and prohibitionist movements ultimately would prove a non-productive, ambiguous digression.[12] On the other hand, an examination of legislative action on the issue (and judicial construction of such acts) provides important information for interpreting the intended scope of our present dram shop act.

"(a) The Vanguard of Temperance: Late 19th Century Prohibition Acts & Their Judicial Interpretation

"As the last Federal troop trains crossed Alabama's northern border at the end of Reconstruction, the temperance and prohibitionist forces began to stir. See, Sellers 40-51. From then until 1909, the movements steadily grew, both in the number of their adherents and in the intensity of their demands. Id., at 52-100.
"Initially, the efforts of the prohibitionist forces to impress their ostensible, moralistic *978 views[13] upon public policy met with only limited success. During the 1880s and 1890s, the movements succeeded only in the enactment of sporadic special acts of legislation prohibiting the `manufacture, or sale, or other disposition of ... intoxicating liquors within the limits of' particular counties, or particular areas of a county.[14]
"Nonetheless, for two reasons, those early efforts at prohibition on a local level provide important precedents for construing the scope of our present dram shop act.[15] First, some of those local prohibition acts contained statutory phrases identical, or strikingly similar to the phrase that is so troublesome in the present case: i.e., `selling, giving or otherwise disposing of....' And second, a number of cases arising under those acts, and requiring a construction of such language, were appealed to the Supreme Court of Alabama. A review of those decisions furnishes helpful interpretive insights.
"The first significant decision is Reynolds v. State, 73 Ala. 3 (1882). In Reynolds, the defendant was indicted and convicted for violating a local act of the legislature which made it a crime to `make, sell, or otherwise dispose of any spirituous or malt liquors' in Dale or Henry Counties. The evidence against him showed that the defendant `gave' two drinks of whiskey to the prosecution's witness at his home. There had been no sale, in the sense of compensation changing hands. On appeal, the Supreme Court reversed, saying:
To dispose of, ... when used in reference to property, means to part with the right to, or ownership of it; in other words, a change of property. If this does not take place, it would scarcely be said that the property is disposed of. ... In this (possibly injurious) act of hospitality, we apprehend no one would entertain the thought of a change of property, or ownershipโthat he was thereby `disposing of' the article thus used and consumed. Quite as appropriate would it be to affirm that the host had disposed of the viands his friend consumed, while enjoying a hospitable dinner with him.
We would not be understood as affirming that no disposition can be made, under the statute we are construing, except by bargain and sale. A gift, consummated by delivery, works as complete a change of property or ownership, as does a sale on valuable consideration. What we declare is, that the act, shown in the evidence in this case, was not a disposing of the liquor, within the contemplation of the legislature.
During the same session of the legislature at which the statute in question was enacted, several other statutes of kindred character received the approval of that body. In some of them we find the same words, `sell, or otherwise dispose of.' Sometimes the language is more express, and inhibits the `giving away' of intoxicating liquors. We do not know that this variance in phraseology changes the meaning, or imposes the duty of a changed interpretation. That question is not now before us.
Reynolds v. State, supra, at 4.
"Three aspects of the Reynolds opinion are worthy of note. First, the Supreme *979 Court did not liberally construe the language of a statute in derogation of the common law.[16] Second, the Court applied the `ejusdem generis rule' when holding that the phrase `otherwise dispose of' meant only a disposition in the nature of a sale.[17] And third, the court reserved for later decision the construction of the phrase `sell, give, or otherwise dispose of.' The opportunity to construe that phrase was presented the Court within a year.
"In Amos v. State, 73 Ala. 498 (1883), the defendant had been indicted and convicted of violating a local act of the legislature which made it a crime to `sell, give away, or otherwise dispose of spirituous, vinous or malt liquors' in Conecuh County. At trial, the prosecution had shown that defendant's father owned a store in Conecuh County, and that the father had ordered five gallons of whiskey for a man named `Bethea.' When the whiskey arrived, Bethea `had no way to take it all away,' so he persuaded the defendant's father to store it for him in a small building the storekeeper used to keep `other things incident to his business.' From time to time, Bethea would come to the store and defendant, or defendant's father, would draw off a portion of the stored whiskey, and give it to Bethea. The evidence further disclosed that defendant, though frequently about his father's store, `was not connected with his father's business in any capacity....' `Id., at 499-500.' On appeal, the Supreme Court reversed, holding that on the foregoing state of the evidence the defendant could not be said to have violated the statute. The defendant had not sold the whiskey to Bethea; his father had.
"Moreover, the defendant had not given the whiskey to Bethea (in the sense of parting with the ownership of property) because Bethea already owned it. And finally, it could not be said that the defendant had `otherwise disposed of' the whiskey because, under the principle of ejusdem generis, that phrase had to be construed as applying only to transactions that fell within the classification of a sale or gift.
The manifest purpose of the statute, taking the words in their ordinary signification, is the prohibition of all dealing in the nature of trade or traffic, in the locality specified.... The effective words are `sell, give away, or otherwise dispose of'; all of which, in a general sense, found in this connection, signify some act by which one person parts *980 with, to another, possession or ownership of property. A sale, ex vi termini, imports the transfer of personal property upon a valuable consideration; and a gift imports a like transfer gratuitously, or upon a merely good consideration. The more general words, `or otherwise dispose of,' following the more specific or particular words, `sell, or give away,' upon a settled rule of statutory construction, a larger legislative purpose not being clearly expressed, must be construed as extending only to a disposition ejusdem generis with a sale or a gift; they are not to be extended to any and every act which may be said to be a disposition. The rule is, when general words follow, in a statute, words of particular and special meaning, if there be not a clear manifestation of a different legislative intent, they are construed as applicable to persons or things, or cases of like kind, as are designated by the particular words. ... It would be a departure from the rule, not necessary to give effect to the Legislative intent, and not within it, to give the general words, `or otherwise dispose of,' a meaning so loose and expansive as to include within them any act not akin to a sale or a gift, not intended as, and not having in it any of the properties of, a parting with property by one person to another. A common carrier, transporting the enumerated liquors to the designated locality, and there delivering them to the consignee, or to the true owner, it may be said, in a large and loose sense, disposes of them. A warehouseman, with whom they were stored, delivering them on demand, could also be said to dispose of them; and a destruction of them intentionally could be denominated a disposition; and yet, these acts are not within the proper significance of the general words, nor are they within the objects and purposes of the statute.

Amos v. State, supra, at 501-02 (emphasis supplied).
"The next case of significance is that of Norris v. Town of Oakman, 138 Ala. 411, 35 So. 450 (1903). In Norris, the defendant had been convicted of violating a city ordinance which made it a misdemeanor to `sell, give away, ... or cause to be ... delivered' any liquors on a Sunday. The evidence at trial established that Norris was both an employee of, and a boarder in the house of, a man named Coudan. Mr. Coudan owned a saloon. One Sunday afternoon, Mr. Coudan instructed Norris `to go down to the saloon and bring up some beer for him and the defendant.' Norris did so, and `he and Coudan and son drank the beer as they desired it' for the rest of the afternoon. For these acts, the defendant Norris was convicted. On appeal, however, the Supreme Court reversed. The Court first noted that Norris could not be convicted for having sold the beer because Coudan owned it. For the same reason, Norris did not `give away' the beer, because one cannot give what one does not own. All of which brought the Court to the word `delivered.'
One may, as a physical fact, deliver to another something he is in possession of but in which he has no personal interest, and which belongs to the one to whom it is delivered. Such an act would have in it no element of a sale or a gratuitous giving away. Reynolds v. State, 73 Ala. 3. Such seems to be the character, exactly, of the delivery of the beer by defendant to Coudan in this case. The word `delivered' implies other and more general meaning than the specific or particular words `sell' or `give away,' as employed in the ordinance, and which words it follows, and must, on a settled rule of statutory construction, be held to extend only to a disposition, ejusdem generis, with a sale or gift. Amos v. State, 73 Ala. 498.
Norris v. Town of Oakman, supra, at 414-15, 35 So. at 451 (emphasis supplied).
"The last case to be considered, Maxwell v. State, 140 Ala. 131, 37 So. 266 (1904), arose out of the following facts.
... G.S. Harmon, a witness for the State, testified that ... he went to the mill owned by John H. Maxwell, the father of the defendant, and asked for the defendant's father, and was told that he was away from the mill; that he waited for *981 the return of the said John Maxwell for about two hours and then stated to the defendant that he could wait no longer, and told him that he wanted to get from defendant's father some whiskey for his (witness') wife, who was sick, and asked the defendant to take the bottle which he gave him, and see if he could get the whiskey for him, stating to defendant that it would be all right with his father, and that his father had before given him whiskey for his wife; that the defendant took a quart bottle which the witness gave him, went away, and brought back a quart of whiskey, and put it in the witness' buggy; that thereupon the witness handed to the defendant 25 cents, and said to him, `That is for your trouble'; that a quart of whiskey was worth 50 cents; and that he knew the defendant was under age. ...
Id. (Emphasis supplied.) On these facts, Buck Maxwell, then sixteen years of age, was convicted on an indictment charging that he `sold, gave away, or otherwise disposed of whiskey without a license, and contrary to law.' On appeal, the Supreme Court reversed, citing Amos v. State, supra. The defendant had not sold the whiskey because Harmon had not paid for it. The twenty-five cents given defendant was in the nature of a tip, because the whiskey was worth fifty cents. Furthermore, defendant had neither sold nor given away the whiskey, because he did not own it. His father did. And, therefore, defendant had not parted with `possession or ownership of property.'
"The importance of the Reynolds, Amos, Norris, and Maxwell line of cases lies simply in this. In each, the Supreme Court construed statutory language strikingly similar to the dram shop phrase that is so troublesome in the case before this Court, and, in the context of legislative enactments prohibiting the sale, gift, or other disposition of intoxicating liquors. Moreover, all of these cases were decided long before the legislature enacted the dram shop act. Consequently, when our Supreme Court has repeatedly construed particular statutory language, and the legislature enacts another statute employing that same language, there arises a strong presumption that the legislature has acquiesced in the Court's interpretation of the legislature's intent in the use of such language.

"(b) Temperance in the Ascendancy: Early 20th Century Prohibition Acts

"Alabama temperance forces were strengthened considerably by two events in the first decade of this century: (1) the formation of the Alabama contingent of the Anti-Saloon League of America in 1904, Sellers 102; and (2) the election of Braxton Bragg Comer as Governor of Alabama in 1906.
"Following the end of Reconstruction, `Bourbon Democrats' from the Black Belt counties and the increasingly influential `Big Mule' industrial interests in Birmingham and Mobile tightened their grip upon state government. See, e.g., V.O. Key, Southern Politics in State and Nation, 42, 46 (1949).
Having weathered the flare-up of agrarian revolt in the 1890's, conservative forces within the state consolidated their control over state government (whose taxing powers were increasingly curtailed) with the constitution of 1901. Both Negroes and many poorer whites were effectively disenfranchised. With the electorate increasingly weighted in their favor, the Black Belt leaders with industrial allies dominated state government for much of the twentieth century.
W.D. Barnard, Dixiecrats and Democrats: Alabama Politics 1942-1950, at 10 (1974).
"Once in a long while, however, a `progressive' candidate for Governor would successfully defy that conservative coalition. B.B. Comer was such a man. Although stigmatized by the press as a radical, a self-willed, impetuous, self-seeking, and generally dangerous man' [A.B. Moore, History of Alabama 664 (1934)], Comer handily won the 1906 gubernatorial election. In the process, many men committed to `progressive' programs rode into the legislature on his coattails. `Not since the development of factionalism within the *982 Democratic party had the progressive wing been so victorious.' Id. 666. Both Comer and his legislative lieutenants were dominated by a `passion for reform.' Id. 667.
Comer left his impress on Alabama. He terminated abruptly the regime of laissez faire and enthroned the new philosophy of public welfare. He put the State into social service in various directions, and during his four years as governor the State made more progress in public education than had been made in all of its previous history. He aroused sentiments and established traditions that are still potent influences in the life of the people. In a word, broadly speaking, it may be said that the New Alabama began with the Comer term. [Id. 672.]
Prohibition was among the most important issues (if not the most important issue) used by Comer to achieve his phenomenal political success. That issue tapped the strength of `the aggressive and powerful Anti-Saloon League.' Sellers 102. The focus of the Alabama Anti-Saloon League's opposition to liquor traffic was implicit in its name. League members felt that saloons bred destitution, prostitution, and other deleterious social institutions (e.g., gambling and racial equality).[18]
"Thus, the cry for the end of the `day of the saloonkeeper, gambler, harlot, and pimp domination in government,' Sellers 130, was pregnant with many connotations. But, without question, racism was prominent among the meanings telegraphed by such `code words.' Even so, that despicable truth should not blind the modern observer to the fact that the primary objective of the prohibitionist forces was the abolition of the business of selling alcohol.
"In the first Regular Session of the Legislature following Comer's election, the prohibitionists succeeded in passing the State's first, general local-option law. 1907 Acts of Alabama, Act No. 149, at 200 (Feb. 26, 1907). That act `permitted the temperance legions to force local option elections with petitions signed by one-fourth of the voters in a county.' S. Hackney, Populism to Progressivism in Alabama 303 (1969). Significantly, the Act provided that the issue to be submitted to the voters of a county was whether they approved, or disapproved of the sale of liquor.
The ballot used in such election shall have printed or written on the same `Against the sale of liquors,' `For the sale of liquors,' and the voter in preparing or casting his ballot shall make a cross mark before the phrase `Against the sale of liquor' or before the phrase `For the sale of liquors' as the case may be....
1907 Acts of Alabama, Act No. 149, ง 6 at 202 (Feb. 26, 1907) (emphasis supplied). If a majority cast ballots `against the sale of liquor,' then the act provided that
It shall not be lawful to sell or otherwise dispose of any intoxicating liquors, drinks, or beverages within the bounds of said county ..., nor shall a license be obtained or granted authorizing ... the sale or other disposition of such intoxicating liquors, drinks or beverages after the date of such election within said county, and all licenses issued before such election shall be null and void and shall not authorize the sale or other disposition of such intoxicating liquors ...; provided subsequent elections may be held under the provisions of this act. And if at any subsequent election held in such county a majority of the votes cast are for the sale of liquors ... then on and after the first day of January next succeeding such election, intoxicating liquors may be sold in such county *983 as the same was authorized to be sold on January 1st, 1908.
Id., ง 14, at 204 (emphasis supplied).
"Clearly, therefore, this State's first general local-option law was aimed at the business of selling intoxicating liquors, and the phrase `or other disposition' should be construed in that context. If there is any doubt about that, it is dispelled by the following provision of the Act.
The provisions of this act shall extend to all sales or other dispositions of intoxicating liquors, drinks or beverages, whether by dispensaries, retailers, wholesale dealers, or any separate or isolated sales or dispositions.

Id., ง 16, at 205 (emphasis supplied).
"The 1907 local-option act was more successful than the temperance forces had hoped. Under its auspices, prohibitionists forced, and won, elections in 58 of Alabama's 67 counties. S. Hackney, supra, 304. See also, Sellers 114.
"`Rather than satisfying the urge for temperance, [however,] the new laws stimulated demand for stricter controls.' S. Hackney, supra, 304. During a special session of the legislature commencing November 7, 1907, the Alabama Anti-Saloon League and its allies pressed their advantage. They demanded the passage of a statewide, general prohibition law. Sellers 118-20.
"Such a bill was introduced by the Speaker of the House of Representatives, A.H. Carmichael of Colbert County, and passed both houses in rapid succession. It was signed into law by Governor Comer on November 23, 1907, and provided that:
it shall be unlawful for any person, firm, corporation, or association, within this State to manufacture, sell, barter, exchange, give away to induce trade, furnish at public places or otherwise dispose of any alcoholic ... liquors or beverages by whatever name called, which if drunk to excess will produce intoxication....
1907 Acts of Alabama (Special Session), Act No. 53, ง 1, at 72 (Nov. 23, 1907) (emphasis supplied).
"Without any question, Alabama's first statewide prohibition act was aimed at those engaged in the business of manufacturing, selling, or distributing liquor. It did not attempt `to restrain a man's private indulgence in drink....' Eidge v. City of Bessemer, 164 Ala. 599, 51 So. 246, 247 (1909). Rather, it specifically provided:
That the provisions of this act shall not prohibit the social serving of liquors and beverages mentioned in this act in private residences in ordinary social intercourse.
1907 Acts of Alabama (Special Session), Act No. 53, ง 12, at 76.

"(c) The High-Water Mark of Prohibition: the 1909 Special Session

"For a while, the passage of a statewide prohibition act satiated the prohibitionists' lust for stricter State controls on the business of liquor. By mid-1909, however, it was obvious that the law was not working well, and that remedial enforcement measures were necessary. `Things got so bad' that the Sheriff of Jefferson County begged Governor Comer
to call a special session of the legislature to put the prohibition `dodgers' out of business. He declared that if `the present status of affairs continues there will soon be more whiskey and intoxicants sold in the county without revenue, than were ever sold under the old saloon regime.' In support of his statement he sent along to the governor a list of clubs organized ostensibly `for the advancement of literature and culture' but which had, among their members, a suspicious number of ex-saloonists and liquor men and which were really only a cover for law breaking.
Sellers 126 (emphasis supplied).
"With the accumulation of such evidence indicating the failure of the statewide prohibition law, Governor Comer acted. On July 15, 1909, he called for the legislature to convene in a special session that same month. In his address to both houses at the beginning of the session, the Governor `frankly declared the statutory prohibition *984 law "inadequate of enforcement."' Sellers 132. He urged firm legislative action in two areas: strict enforcement legislation, and, an amendment to the State Constitution prohibiting the manufacture or sale of alcoholic liquors. The history of both proposals provides important information for interpreting the scope of our present dram shop act and, hence, each proposal will be discussed separately.

(i) The Carmichael-Fuller Acts

"In that portion of his speech calling for `more strenuous prohibition' enforcement legislation, Governor Comer told the Legislature that:
violation of your [statewide, general] prohibition law ... has almost come to the point when you must determine for the people whether whiskey shall dominate and control the State, or the State dominate and control whiskey. I assure you that the open, persistent disrespect of any law engenders serious conditions, and you had better never have touched the prohibition question unless you make the penalty for violations prompt and sure.
The Huntsville Weekly Mercury, July 28, 1909, p. 1 at col. 2. See also, Sellers 132.[19] In response to the Governor's call, two of his chief lieutenants in the House (Speaker A.H. Carmichael and Representative J.T. Fuller) introduced companion bills to stanch the flow of liquor. Both bills passed without difficulty.
"Speaker Carmichael's bill passed first, and was signed into law by the Governor on August 9, 1909. 1909 Acts of Alabama (Special Session), Act No. 7, at 8 (Aug. 9, 1909). It declared that
It shall be unlawful for any person, firm, or corporation or association within this State to manufacture, sell, offer for sale, keep or have in possession for sale, barter, exchange, give away, furnish at public place or elsewhere, or otherwise dispose of the prohibited liquors and beverages described in section 1 of this act, or any of them, in any quantity....
Id. ง 3, at 9. The contemporary value of the legislation lay in the fact that it increased both the period of imprisonment and the amount of fines that might be imposed for violation of its provisions, and, the provisions of the first statewide prohibition act which had taken effect on November 23, 1907. It further provided that each day that a business operated a brewery or distillery or `vender of intoxicants' constituted a separate offense.
"For present purposes, however, the chief importance of the Carmichael bill is found in that proviso which stated that
this inhibition does not include, and nothing in this act shall affect the social serving of ... liquors or beverages in private residences in ordinary social intercourse.
Id. Thus, it is beyond dispute that the Carmichael bill was aimed at those engaged in the business of manufacturing, selling, or distributing liquor for a profit.
"Although the Carmichael bill was called `radical,' critics had to get out their dictionaries to find stronger invectives to describe its companion legislation. The Fuller bill was described by the Montgomery Journal as `the most drastic prohibition bill ever brought to the attention of any legislature.' Sellers 133. It was an omnibus, prohibition enforcement measure. It contained 39 sections, spilling ink over 33 pages of the statute book. It outlawed everything from the manufacture of intoxicants to the advertisement of liquor, and covered just about everything in between.[20]
*985 "But, for present purposes, the primary importance of the Fuller bill lies in the fact that section eight created the Alabama dram shop law. 1909 Acts of Alabama (Special Session), Act No. 191, ง 8, at 65-66 (Aug. 25, 1909): quoted herein, supra. That fact, then, leads one back to the question of what the legislature intended when it first said, in section eight of the Fuller bill, that certain plaintiffs injured in their person, property, or means of support by an intoxicated person had a right of action for damages against
any person who shall by selling, giving or otherwise disposing of to another contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person....
Id. Two considerations indicate that the legislature only intended for such action to lie against commercial vendors of liquor.
"The first consideration comes from the fact that the Carmichael and Fuller bills were `companion laws ... to be construed together.' Grace v. State, 1 Ala.App. 211, 56 So. 25, 26 (1911); Priest v. State, 5 Ala.App. 171, 59 So. 318, 319 (1912). Consequently, the express provision of the Carmichael Act stating that it did not apply to `the social serving of ... liquors or beverages in private residences in ordinary social intercourse' must be read in pari materia with the provisions of the Fuller Act.
"The second considerationโfound in the text of the Fuller Act itselfโbuttresses the first. Thus, section four of the Fuller Act provided:
4. That the keeping of liquors or beverages that are prohibited by the law of the State to be manufactured, sold or otherwise disposed of in any building not used exclusively for a dwelling shall be prima facie evidence that they are kept for sale, or with intent to sell the same, contrary to law.
1909 Acts of Alabama (Special Session), Act No. 191, ง 4, at 64 (Aug. 25, 1909) (emphasis supplied). This provision now is codified at Ala.Code ง 28-4-92 (1975). In like manner, section 22(12) of the same Act provided in part that:
The keeping of prohibited liquors in any building not used exclusively for a dwelling shall be prima facie evidence that the same are kept to be sold or otherwise disposed of or delivered or furnished contrary to law....
Act No. 191, ง 22(12), supra, at 81 (emphasis supplied).
"Of course, both provisions created evidentiary presumptions. But, a fair reading of them indicates that the reverse of the presumption also is true: i.e., that the keeping of `prohibited liquors' in any building used exclusively for a dwelling is not prima facie evidence that the liquor was kept for the purpose of selling, or otherwise disposing of the same, `contrary to law.' The Alabama Court of Appeals so held.
[T]he mere possession of prohibited liquors in a building used exclusively for a dwelling is not prima facie evidence that the whiskey was kept for sale.
Strickland v. State, 20 Ala.App. 600, 104 So. 351 (1925). See also, Carmichael v. State, 11 Ala.App. 209, 65 So. 694, 695 (1914); Hauser v. State, 6 Ala.App. 31, 60 So. 549, 552 (1912).
"It follows, therefore, that the Fuller Act (like the companion Carmichael Act) was not aimed at social hosts who dispensed alcohol in the privacy of their own home to guests, as an act of social hospitality. While no appellate decision has been found which expressly holds that such a logical *986 progression is true, two in particular hint that this court's interpretation is correct.
"For example, in Salley v. State, 9 Ala. App. 82, 64 So. 185, 187 (1914), the Alabama Court of Appeals held that the discovery of 55 gallons of whiskey in a building located some 20 to 30 feet from the defendant's residence:
would dispel any reasonable belief that it was kept for personal consumption or for the purpose of dispensing hospitality in ordinary social intercourse at the dwelling of the defendant....
"In another case, the same court held that evidence showing the defendant had delivered whiskey to the prosecution's witness in a shed adjoining a poolroom:
utterly repudiate[d] the idea that the case falls within the exception applying to gifts by one at his private residence, as an act of hospitality in ordinary social intercourse. ... [T]he defendant... can hardly be fancied by the most imaginative as in the role of a host in his private residence, in ordinary social intercourse, dispensing hospitality.
Grace v. State, 1 Ala.App. 211, 213, 56 So. 25 (1911) (emphasis supplied). See also, Toole v. State, 170 Ala. 41, 54 So. 197, 199 (1911).

(ii) The Constitutional Prohibition Election of 1909

"If there was any doubt lingering in the mind of this court over the correctness of the conclusion that the legislature did not intend for the dram shop act to apply to social hosts, or other non-commercial suppliers of liquor, then it was dispelled by the history of the constitutional amendment battle of 1909.
"In his speech to both houses of the legislature at the beginning of the 1909 special session, Governor Comer recommended that an amendment to the Alabama Constitution be submitted to the voters
so as to prohibit the manufacture, sale, and keeping for sale of alcoholic ... liquors and beverages, ... and providing for the designation in the amendment or by the Legislature of places where such liquors and beverages may be stored and kept.

Sellers 130-31 (emphasis supplied). A bill proposing such an amendment passed the legislature in short order, and was signed by the governor on August 18, 1909. In pertinent part it provided that the following question should be submitted to the voters at a special election to be held that year:
`Shall the following be adopted as Article XIX of the Constitution of Alabama: Section 1. The manufacture, sale and keeping for sale of alcoholic and malt liquors and other intoxicating beverages shall be forever prohibited in this State; but alcohol may be sold for medical, scientific and mechanical purposes, and wine for sacramental purposes, under such regulations as the Legislature may have prescribed or may hereafter prescribe. Section 2. Nothing in the constitution of Alabama shall be construed to prevent the legislature under the police power from designating places where such liquors may not be stored or kept. Yes, No.' The choice of the elector shall be indicated by a cross-mark made by him or under his direction opposite the word expressing his desire.
1909 Acts of Alabama (Special Session), Act No. 21, ง 3, at 21 (Aug. 18, 1909) (emphasis supplied).
"Opposition to the proposed amendment centered on the emphasized language. Those opposed to the amendment charged that the language was designed to close the loophole in the Carmichael-Fuller Acts which allowed private individuals to keep liquor in their homes, and to dispense liquor as an act of hospitality in ordinary social intercourse. Emmet O'Neal of Florence, who would be elected Governor of Alabama in 1910, largely as a result of his leadership of the anti-amendment forces,
sounded the keynote of the campaign [to a massive rally in Montgomery on September 15,] and gave his listeners their slogan when he said: `If this amendment is ratified, it means the legislature can invade the home.' `The sanctity of the home must be kept inviolate,' swore the *987 delegates, and they prepared to ring the changes on this theme.
Sellers 135.
"The campaign over the amendment was intense, bitter, and heated. Every major politician in the State was drawn into the fray, and publicly chose sides. Id. 141-42. Many considerations for and against were debated, but the focus of discussion and decision was section two, and the question of whether the legislature should be constitutionally empowered to prevent individuals from keeping liquor in the privacy of their homes. See id. 133-48; A.B. Moore, History of Alabama 673-74 (1934).
Both sides went to the polls [on November 29, 1909] confident of victory. Intense excitement marked the day, but excellent order was maintained on the crowded streets and at the polls. Probably the anti-amendment forces were only a little less surprised than the prohibitionists when the official count of that day's votes showed 72,272 against, and 49,093 for the amendment. No one had foreseen so overwhelming a defeat for the measure.
The amendment lost in all but six counties, and in these six the total favorable majority was only 467. ... All of the large urban centers voted against the amendment. The will of the people seemed clear.
Sellers 147.
"5. Conclusions on the Scope of the Dram Shop Act
"Not only did the `will of the people' seem clear in their rejection of the prohibition amendment, but, with the clarity of hindsight, the intent of the legislature when it passed the Carmichael-Fuller Acts also now seems clear. Even though the dram shop section contains the phrase `giving or otherwise disposing of to another,' those wordsโwhen placed in the context of their legislative and judicial historyโclearly do not have a scope of operation as broad as would first appear. Rather, the words properly were intended to apply only to those who furnished liquor owned by them to another person in return for monetary compensation or other consideration.
"The foregoing conclusion is not weakened by the fact that the Alabama Legislature defined the phrase `otherwise dispose of' in the Fuller Act. Tucked away in section 31 of that Act, one finds the following:
... and the term `otherwise dispose of' following the words, sell, offer for sale or keep for sale, and the term `otherwise disposed of' following the words sold, offered for sale, kept for sale, when employed in any warrant, process, affidavit, indictment, information or complaint, or in any bill in equity or other pleadings in any judicial proceeding or in any judgment or decree shall include and be deemed to include barter, exchange, giving away, furnishing, or any manner of disposition by which said liquors and beverages may pass unlawfully from one person to another;
....
1909 Acts of Alabama (Special Session), Act No. 191, ง 31, at 91. This provision now is codified at Ala.Code, 28-4-1(4) (1975). The words `barter' or `exchange' are just terms which refer to another species of a `sales' transaction. In a sale, the consideration for the transfer is money. In a `barter' or `exchange,' the consideration is either other property, or services, of equivalent value. See, 45 Am.Jur.2d Intoxicating Liquors งง 239-241 (1966). The phrase `giving away,' as noted by the decisions of the Alabama appellate courts discussed earlier ..., would denote the transfer of property owned by one person to another person without consideration that could be measured in terms of money or other indices of value. See, e.g., id. ง 247. See also, Clark v. State, 167 Ala. 101, 52 So. 893 (1910) (Mayfield, J., dissenting). The concluding words of the statutory definition would, in accordance with the ejusdem generis rule of statutory construction, have to be read as applying only to transactions of the same general kind or class as barter, exchange, or gift.
"It follows from all that has been said thus far, therefore, that a dram shop action does not lie against either the Huntsville Jaycees, Inc., or Richard P. Watts, because:
*988 "(1) Neither defendant is a commercial vendor, nor did either sell the beer to the HHS Jr. Jaycees (or Warren Lee Bradford); rather, Turner Beverage Company did.
"(2) They did not give the beer to the HHS Jr. Jaycees (or Warren Lee Bradford) because they had no ownership or property interests in the beer. Rather, Turner Beverage Company owned the beer, and, all monies used to acquire the beverage company's property interest in the beer came from Jr. Jaycee funds.
"(3) They did not otherwise dispose of the beer because, as discussed above, that phrase must be construed [under the ejusdem generis principle] with the words `sell' and `give,' and neither the Jaycees nor Richard Watts disposed of any ownership or property interests in the beer.
"B. DOES A COMMON LAW NEGLIGENCE ACTION LIE?
"Having concluded that a dram shop action does not lie against the Huntsville Jaycees, Inc., and Richard P. Watts, the second question must be addressed: Does an action grounded on common law negligence principles lie against either defendant?[21]
"Until just recently, the answer to that question would have been an easy, unequivocal `no.' For example, it was only a few years ago that the plaintiff in DeLoach urged the Alabama Supreme Court to `recognize an action for common law negligence for [dispensing] alcohol....' He argued that King v. Henkie should be cast onto the scrap heap of history because
social attitudes and public policy have changed since King was decided, and ... this court should change the law to meet society's change.
DeLoach v. Mayer Electric Supply Co., 378 So.2d 733, 735 (Ala.1979). The Supreme Court rejected that plea, saying tersely: `The rule expressed in King is as viable today as when first expressed.' Id. In a prescient phrase, however, Mr. Justice Bloodworth added:
We do not choose, at this time, to depart from the rule expressed in King and followed by a majority of jurisdictions.
Id. (Emphasis added.) Mr. Justice Bloodworth's portentous phrase may now, several years after his death, have come to pass.
"In Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala.1984), the Alabama Supreme Court partially overruled King v. Henkie, and recognized a common law negligence action against a commercial licensee for the on-premises sale of alcoholic beverages to a visibly intoxicated patron. The facts of the case were summarized by Mr. Justice Faulkner as follows:
[A]bout 5:30 in the morning of July 29, 1981, David Slaughter entered the Checkers Lounge in Dothan after an all-night drive from Florida. He commenced drinking and continued imbibing until around noon, when he left with a waitress. Thirty minutes later he returned and remained at the lounge until around 5:00 P.M. Although Slaughter became visibly intoxicated while in the lounge, the lounge's employees continued to serve him alcoholic beverages up until the time he left. About fifteen minutes after leaving the lounge, the automobile which Slaughter was driving left the road and careened through the yard of the plaintiff's mother, killing her as she worked in her garden.
Id. at 122. The son of the deceased brought suit against the corporation which did business as the `Checkers Lounge.' The action was founded on the dram shop act. Ala.Code ง 6-5-71 (1975).
"However, defendant had clever counsel who discovered that, in 1980, when amending the Alabama Alcoholic Beverage Licensing *989 Code, the Legislature had inadvertently repealed that statute which made it unlawful for an on-premises licensee to `sell, furnish or give any beverages to any person visibly intoxicated....' Ala.Code 23-3-260(2) (1975) (repealed by Act No. 80-529, 1980 Acts of Alabama, effective Sept. 30, 1980). Hence, plaintiff could not prove one of the essential elements of the dram shop action: a sale `contrary to law.' The trial court, accordingly, granted defendant's motion for summary judgment.
"On appeal, therefore, the Alabama Supreme Court was `faced with an anomalous situation,' `id. at 124, in which the facts were egregiously hard, but in which the trial judge had unquestionably ruled correctly. Due to the `emasculation of the dram shop statute by the passage of the new alcohol licensing act' (id. at 123), no action arose under the statute. And yet, the court was convinced that the loophole through which defendant had squiggled was `the result of legislative oversight, not legislative wisdom'; and that the legislature had not intended to
legalize the sale of alcohol to visibly intoxicated persons, to minors, and to insane persons. To the contrary, it appears to us that the legislature was very concerned with the problem of drunken driving. In the same term during which the new alcohol licensing act was passed, the legislature passed a new drunk driving law ... granting trial courts new powers to suspend driving licenses of those convicted of drunk driving upon their first conviction and providing for increased penalties and a mandatory suspension of driving privileges for second and subsequent convictions. ... The stated purpose of the new drunk driving laws was to `do a better job of helping to identify the problem drinking driver and keep him off the highways.' Commentary to ง 32-5A-191. Unless the legislature was afflicted with a collective split personality, it is difficult to believe that it intended to give taverns carte blanche authority to continue serving alcohol to visibly intoxicated patrons, given its concern for drunken driving. If it had intended to do away with the dram shop statute the legislature would have repealed the statute itself, not just its teeth.
Id. at 123-24 (emphasis supplied).
"Toothless though it might be, the Court could not `rewrite the dram shop statute. It exists, regardless of intent, as written.' Id. at 124. Therefore, the Court was forced to consider the question of whether the plaintiff might proceed under a negligence theory. A bare majority of the Court held that he could. (Buchanan is a five-four decision.) The clearest statement of the majority's holding is found in the following extract.
The recognition of a cause of action for the negligent sale of alcohol by a licensee for on-premises consumption to one who is visibly intoxicated will discourage drunk driving by discouraging the sale of alcohol to patrons who lack the self control to cease drinking when they have `had enough.'
Id. at 127 (emphasis supplied).
"In effect, the majority held that the law imposed a duty upon licensees for on-premises consumption to refrain from continuing to sell alcohol to visibly intoxicated patrons, in order to protect a class of third persons which included plaintiff's decedent.
"Thus, King v. Henkie was overruled. But only just enough to allow `this plaintiff to have his day in court.' Id. at 128. The court expressly limited its holding, and its overruling of King v. Henkie, to cases involving the on-premises sale of liquor by licensed, commercial vendors. The limited nature of the majority's holding is demonstrated by the following extracts from the opinion:
We recognize that the rule that there could be no common law cause of action for negligently serving alcohol, which was espoused in King, was reaffirmed in DeLoach, supra. DeLoach is, however, distinguishable from the facts presented here. It did not involve a licensed vendor. Had these facts been alleged in DeLoach, a cause of action would have *990 been stated under the dram shop statute.... [Id. at 127 (emphasis added).]
* * * * * *
Finally, the defendant argues that the recognition of a common law action for negligently dispensing alcohol would allow actions to be brought against social hosts. That result does not necessarily follow. Most of the states which have recognized a common law action for negligently dispensing alcohol have restricted those actions to instances of sales by vendors. Only New Jersey, in Kelly v. Gwinnell, [96 N.J. 538, 476 A.2d 1219 (1984)], has extended liability to social hosts. There is an arguable distinction between licensed vendors and social hosts based on the governmental interest which supports the statutory requirement that commercial vendors of alcohol be licensed. An analogy to that position may be found in products liability law. The rule stated in ง 402A of the Restatement of Torts (Second) does not apply for instance to a `housewife who, on one occasion, sells her neighbor a jar of jam or a pound of sugar.' Comment f to ง 402A. We hasten to point out, however, that the question of a social host's liability is not before us and we specifically decline to decide that issue. ... [Id. at 127-28 (emphasis added).]
"The extremely limited scope of the Buchanan holding also is demonstrated by the majority's choice of supporting authorities.
We find precedent for the proposition that legislatively created principles of dram shop liability, not fully implemented by the acts themselves, can be effectuated by a common law negligence action in the case of Waynick v. Chicago's Last Department Store, 269 F.2d 322 (7th Cir.1959). ...
Id. at 124. Later in the opinion, the majority cites the following decisions as examples of instances in which `other states have ... recognized common law negligence actions under similar facts' (id. at 127): Ontiveros v. Borak, 136 Ariz. 500, 667 P.2d 200 (1983) (en banc) (allowing negligence action against commercial licensee for sale to visibly intoxicated patron); Kelly v. Gwinnell, 96 N.J. 538, 476 A.2d 1219 (1984) (allowing negligence action against social host who personally and `directly serves' liquor to a visibly intoxicated guest, and `continues to do so even beyond the point at which the host knows that the guest is intoxicated, and does this knowing that the guest will shortly thereafter be operating a motor vehicle'); Hutchens v. Hankins, 63 N.C. App. 1, 303 S.E.2d 584 (1983) (allowing negligence action against commercial licensee for sale to visibly intoxicated patron, with knowledge that patron will drive from the premises); Sorensen v. Jarvis, 119 Wis.2d 627, 350 N.W.2d 108 (1984) (allowing negligence action against a retail establishment for knowing sale to a minor); and, McClellan v. Tottenhoff, 666 P.2d 408 (Wyo.1983) (allowing negligence action against commercial vendor for knowing sale to a minor).
"One must ask, what does the majority's choice of authorities tell us about its decision? What do the six cases have in common? Only one (Kelly) involves social host liability; so that is not the point. Two (Sorensen and McClellan) involve minors; so that might be, but probably is not, significant. Five of the six (i.e., all but Kelly) involve sales of liquor by commercial vendors; so that obviously is a significant common denominator. However, there is one factor which all of the cited cases share, and that is: all arose either in jurisdictions that had no dram shop statute, or under circumstances in which no dram shop act was in force and effect.
"For example, in Waynick, neither the Michigan nor the Illinois dram shop statute applied to the peculiar facts of that case. (See the Buchanan majority's discussion of Waynick at 124-25.) In Sorensen, the Wisconsin dram shop act had been repealed by that state's legislature in 1982 (see 350 N.W.2d at 113 and n. 8). In Ontiveros, Arizona had no dram shop act (see 667 P.2d at 211-12). In McClellan, Wyoming had no dram shop act (see 666 P.2d at 411). At the time of plaintiffs' injuries in Hutchens, North Carolina did not have a dram shop *991 act (see 303 S.E.2d at 588). And New Jersey did not, and does not now, have a dram shop act (see Kelly, 476 A.2d at 1221).
"Moreover, counting the decision of our supreme court in Buchanan, the decision of the Wisconsin Supreme Court in Sorensen, and the decision of the North Carolina Court of Appeals in Hutchens, one finds that a majority of the states (twenty-seven in all) now have allowed a negligence action against commercial vendors of liquors for injuries sustained by third persons as a result of the acts of an intoxicated person. Significantly, however, the overwhelming majority of those states (22 out of 27) did not have a dram shop, or civil damage, act in force on the date the action arose. Compare the list of decisions in the `Appendix' to Sorensen v. Jarvis, 350 N.W.2d at 119-20, with 12 Am.Jr. Trials 729, "Dram Shop Litigation" ง 2 (1966).
"There can be little doubt, therefore, that the absence of a statutory, dram shop remedy has been a substantial factor influencing those courts which have extended negligence liability to commercial vendors of intoxicating liquor. As the New Jersey Supreme Court observed in Kelly:
Whether mentioned or not in these opinions, the very existence of a Dram Shop Act constitutes a substantial argument against expansion of the legislatively-mandated liability. Very simply, when the Legislature has spoken so specifically on the subject and has chosen to make only licensees liable, arguably the Legislature did not intend to impose the same liability on [social] hosts.
Kelly v. Gwinnell, 96 N.J. at 554, 476 A.2d at 1227 (emphasis supplied).
"The statutory vacuum created by legislative inadvertence, in which the Buchanan majority operated, now has been filled by administrative regulations promulgated by the A.B.C. Board. Regulation 20-X-6-.02. Thus, in one sense, the Buchanan decision may be sui generis. We may never see its like again. (At least, in the absence of a similar legislative (or administrative) error.) That also is an argument against expanding the Buchanan negligence action beyond commercial vendors, to encompass defendants such as those before this Court. The majority hinted as much when they said:
Most of the states which have recognized a common law action for negligently dispensing alcohol have restricted those actions to instances of sales by vendors.... There is an arguable distinction between licensed vendors and social hosts based on the governmental interest which supports the statutory requirement that commercial vendors of alcohol be licensed.
Buchanan v. Merger Enterprises, Inc., supra, at 127-28 (emphasis supplied).

"V. CONCLUSIONS OF LAW AND ORDER ON MOTIONS
"Therefore, this Court concludes that an action based upon common law negligence principles does not lie against either of the moving defendants. In view of the clear legislative intent gleaned from the history of the Carmichael-Fuller Acts, and, the carefully limited holding of the Buchanan majority, it is not the province of this court to define a new cause of action against non-commercial entities. That law-making prerogative lies either with the Alabama Supreme Court or, more properly, the Alabama Legislature.
"Accordingly, it is ORDERED, ADJUDGED, and DECREED that the motions for summary judgment of defendant HUNTSVILLE JAYCEES, INC., and, defendant RICHARD P. WATTS be, and the same hereby are, GRANTED.
"In accordance with Rule 54(b), Ala.R. Civ.P., the Court determines there is no just reason for delay, and expressly directs that judgment be entered in favor of the HUNTSVILLE JAYCEES, INC., and RICHARD P. WATTS, and against plaintiffs on all claims.
"In accordance with the foregoing, it also is CONSIDERED, ORDERED, ADJUDGED, and DECREED that plaintiffs have and take nothing of defendants HUNTSVILLE JAYCEES, INC., and RICHARD P. WATTS, and that these consolidated actions be, and the same hereby *992 are, DISMISSED with prejudice as to said defendants. Costs are taxed to plaintiffs, for which execution may issue.
"DONE and ORDERED this 14th day of May, 1985.
"S/Lynwood Smith "Circuit Judge"
NOTES
[1] Permission had been sought to use the building for the party. Though the HHS Jr. Jaycees had been allowed to use the building on at least one prior occasion, permission was denied. The evidence suggests the possibility that the request was denied because the adult organization knew that alcoholic beverages would be served at the party.
[1] Randy Morris, Youth Assistance Director of the defendant Jaycees during the administration of Ernest Kaufmann, testified during deposition that one of his goals that year was that of establishing `a Junior Jaycee Chapter in each of the area high schools, based on the Jaycee Creed.' During the 1980-81 organizational year, only two of the City's five high schools had Junior Jaycee Chapters: S.R. Butler High School and Huntsville High School."
[2] This emphasized language raises the question of `why' the request was refused. Was it because the defendant Jaycees were aware that alcohol beverages were consumed by the Junior Jaycees at their `senior party' and for that reason refused the request? The record on this point is ambiguous.

"Ernest Kaufman testified that some unidentified members of the HHS Jr. Jaycees
came to our Board meeting and made a request that year [i.e., 1981] for two items. One being their annual awards banquet, number two, being able to use our building for an additional party of which they were refused the second request.
Kaufman stated the second request was refused `[b]ecause we wanted to have them one time a year for an annual awards banquet and that was it.'
"On the other hand, Randy Morris (Kaufmann's Youth Assistance Director) acknowledged that the second request for use of the Bonn Building was for the party ultimately held on Guntersville Lake, but he could not `remember' whether the request was refused because the Board had knowledge that beer was dispensed at that party."
[3] See, for example, page 2 of the `Brief in Support of Defendant, Huntsville Jaycees, Inc.'s Motion for Summary Judgment,' where counsel says:

The allegation has been made that at the time of the occurrence, May 16, 1981, David Worley was a Huntsville Jaycees' sponsor for the Huntsville High Junior Jaycees and was the person who arranged for the beer to be purchased for the party. * * * * [Emphasis supplied (by Judge Smith).]"
[4] Ernest Kaufmann does not deny that Worley was the sponsor. Rather, he states that Randy Morris appointed John Zachary `to oversee' the activities of the two high school chapters; and he thus `assumes' that Zachary served as the liaison; but admits he did not `personally know' that to be true.

"In like manner, while Randy Morris began his deposition by denying that David E. Worley was sponsor, he finally admits: (1) that he does not know; and (2) that John Zachary would have been in charge of designating the sponsor for each of the two high school chapters."
[5] On May 15 and 16, 1981, the city schools still were in session for the year."
[6] It should be noted that defendant David E. Worley denies any knowledge of how, or where, the beer was purchased. Without question, that is a material fact. But this Court doubts that a genuine issue has been made of it. In any event, this court will jump over Worley's denial for the moment, in order to reach the questions of law which are raised by the pleadings."
[7] For a list of those states which have Dram Shop Acts, see 12 Am.Jr. Trials ง 2 ["Dram Shop Litigation"]. See also, Note, 9 Cumber.L.Rev. 613, 615 & nn. 16-20 (1978)."
[8] Indeed, another common law principle, closely related to the rationale of cases such as King v. Henkie, was that which held an intoxicated person to the same standard of conduct as if he were sober. See, Prosser, Handbook of the Law of Torts ง 32 (4th ed. 1971).

This rule was premised on the belief that intoxication would be too easy to assert as an excuse for any misconduct. Thus, the inebriate alone was held responsible for his acts causing injury.
Note, 14 Cumber.L.Rev. 411, 413 (1984). The point was referred to by the Alabama Supreme Court in King when it said:
A drunkard, or one in a state of voluntary intoxication, can scarcely claim so much charity from the law ... as imbeciles and lunatics, because he has by his own agency, either wantonly or negligently, brought about his own misfortune. As drunkenness is no excuse for crimes, or for torts, no more should it be a basis for the liability of another in an action brought against him by the victim of such inebriety.
King v. Henkie, supra, at 511. Thus, it is doubtful that the common law courts' position would have been any different, even it it had not occurred to them to lay the `proximate cause' of injury in the cup of the drinker, rather than the bottle of the seller."
[9] For a discussion of the temperance movement and its role in the movement for dram shop acts, see Ogilvie, History and Appraisal of the Illinois Dram Shop Act, 1958 U.Ill.L.F. 175."
[10] The plaintiffs in the Miller case were injured by an automobile driven by a person who became intoxicated while attending a picnic sponsored by a voluntary association of employees of the Owens-Illinois Glass Company at its Madison, Illinois, plant. The picnic was held on premises owned by the employer, with its consent. Suit was brought against the employees' association and the employer under the Illinois dram shop act. In pertinent part, that act provided:

Every person, who shall be injured, in person or property by any intoxicated person, shall have a right of action in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving alcoholic liquor, have caused the intoxication, in whole or in part, of such person; * * * *
Miller v. Owens-Illinois Glass Co., supra, at 419, 199 N.E.2d at 304, 8 A.L.R.3d at 1409.
"The defendants filed motions for summary judgment grounded on affidavits asserting that neither was engaged in the business of selling liquor. The motions were granted and plaintiffs appealed. Thus, the Illinois Appellate Court was presented the question of whether that State's dram shop act applied: (1) to a voluntary club or association which holds a social function at which intoxicating liquors are served to the members and guests; or (2) to the owner of property who permits a voluntary club or association to hold a social function on its property, at which intoxicating liquors are served to members and guests. The appellate court responded negatively to each question, and held that the Illinois dram shop act was intended to regulate the business of selling, distributing, manufacturing and wholesaling alcoholic liquors for profit. In other words, it was to regulate those in the business, not the social drinker or the social drinking of a group.
Id. at 423, 199 N.E.2d at 306, 8 A.L.R.3d at 1411 (emphasis supplied)."
[11] See, e.g., W.J. Cash, The Mind of the South 231-233 (1941: Vintage ed.); S. Hackney, Populism to Progressivism in Alabama 302-305, 316 (1969); A.B. Moore, History of Alabama 666-679, 753-757 (1934)."
[12] Prohibition is not presently regarded as a `progressive' measure. But the historic reality of Progressivism [as a political movement] is sometimes at odds with the

value-laden adjective `progressive.' Prohibition sentiment had been strong among the Progressive forces in the South. Prohibition was just one among the many economic, political, and social reforms that constituted the curiously polyglot movement, Progressivism. The strength of its appeal in the South may represent, as Dewey Grantham suggests, an enduring conservatism in matters moral and social, an essentially romantic willingness to be distracted from the hard, real problems of economics and class interest by quixotic crusades for some mystical goal of publicly enforced moral purity.
W.D. Barnard, Dixiecrats and Democrats: Alabama Politics 1942-1950, at 25 (1974). See also, id., at 9-10, 160 & n. 13."
[13] As is so often the case when public figures self-righteously assume the cloak of virtue, one finds they have other vices aplenty. In this case, the prohibitionists' clay feet were molded from the grimy soil of racism. In the name of protecting a `traditional way of life,' they struck at Blacks.

Another [reason for the rapid growth of the prohibition movement] was the will to [master] the Negro [who], when primed with a few drinks of whiskey, was ... lamentably inclined to let his ego a little out of its chains and to relapse into the dangerous manners learned in carpetbag days.... And it seems genuinely to have been believed that to forbid the sale of legal liquor, and so presumably to force up the price of the bootleg product, would be to deprive him of alcohol altogether and so make it easier to keep him in his place.
W.J. Cash, supra, note 11, at 232."
[14] See, e.g., Sellers 67-68 & n. 104; S. Hackney, supra, 302."
[15] A perusal of the general, special and local laws regulating the sale of intoxicating beverages prior to 1907 shows the growth and development of the desire on the part of the people of Alabama to restrict the sale thereof.

`Editor's Note,' The Alabama Code of 1928, at 742 (Michie 1929) (not adopted by Legislature) (emphasis supplied)."
[16] Indeed, the early decisions of the Alabama appellate courts were very restrictive in their interpretation of language found in the prohibition statutes. For example, in Coker v. State, 91 Ala. 92, 8 So. 874 (1891), the Alabama Supreme Court was presented a case in which the defendant had been convicted for `selling or giving' liquor to a minor in violation of a local prohibition act. The evidence at trial showed that the minor had attempted to purchase whiskey from the defendant, but the defendant `told him that he had no whiskey for sale, and refused to sell him any.' The minor testified that he then `borrowed' a pint of whiskey from the defendant; and that several days later, when he happened upon the defendant who was en route to Montgomery in his wagon, he (the minor) told defendant that he did not have:

any whiskey on hand to return the whiskey he had borrowed from the defendant as before stated, [and] he handed the defendant some money, and requested him to buy as much whiskey in Montgomery as the [minor] witness had borrowed from him, and in that way returned the whiskey he, witness, had borrowed from him.
Id. The Supreme Court reversed the conviction because the trial court had erred in charging the jury that the transaction was a `giving' or `selling' contrary to law, rather than a `loan' or `barter.'
The statute is a highly penal one, and cannot be extended beyond its letter by the result, necessarily more or less uncertain, of speculations into the realms of supposed legislative intent, or the supposed evils aimed at by the law-makers. The alleged offender must be tried upon what the law-giving power has said, and not by what it may be inferred, with greater or less assurance of safety, it has intended beyond the language employed.
Coker v. State, supra at 94-95, 8 So. at 875."
[17] On this point, Black's Law Dictionary 464 (5th ed. 1979) says:

In the construction of laws, wills, and other instruments, the `ejusdem generis rule' is, that when general words follow an enumeration of persons or things by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned....
See also, Maples v. Chinese Palace, Inc., 389 So.2d 120, 124 (Ala.1980); Brook v. Cook, 44 Mich. 617, 7 N.W. 216 (1880)."
[18] This attitude is capsulized in the following:

The saloon is a place of rendezvous for all classes of the low and vulgar, a resort for degraded whites and their more degraded negro associates, the lounging place for adulterers, lewd women, the favorite haunt of gamblers, drunkards and criminals. Both blacks and whites mix and mingle together as a mass of degraded humanity in this cess-pool of iniquity. Here we have the worst form of social equality, but I am glad to know that it is altogether among the more worthless of both races.
J.F. Clark, `The Saloon and Racial Equality,' in Alabama Christian Advocate, January 4, 1906: quoted Sellers 101."
[19] In stating that the issue confronting the legislature was `whether whiskey shall dominate and control the State, or the State dominate and control whiskey,' Governor Comer was speaking of the whiskey lobbyists, representing those businesses which profited from the manufacture, sale, and distribution of liquor."
[20] This was a sweeping bill. Buildings should not be let for the sale or making of intoxicants or such violation permitted in them. Tenants violating this act forfeited their leases.... [I]t was made unlawful to advertise liquor in any public place. The keeping of liquors in any place but a residence was prima facie evidence that they were kept for sale, or intended for sale. Delivery of liquor to any public place was an evidence of sale. It was a misdemeanor for any railroad or boat employees to be intoxicated while on duty. In case of injury to any person caused by one who was drunk, damages could be obtained from the man who sold the liquor. Heavy fines were imposed for selling liquor from behind screens or other obstructions. Judges were required to charge, and grand juries which had testimony had no discretion but to indict. Witnesses who refused to testify were in contempt of court, and even servants could not be excused from testifying against principals. Storage of liquor in any public place was a violation of the law. The law prohibited soliciting from without the state. Sheriffs were authorized to procure lists of United States liquor licenses every month and have them published in heavy black type, with the name and location of the business. Prohibited liquors were contraband when they were stored in violation of the law. Search could be made by warrant, and the presence of government license was prima facie evidence of guilt....'

Sellers 133 n. 30 (emphasis supplied."
[21] Plaintiffs have neither pled, nor does the Pre-Trial Order recite, a negligence claim against either defendant. Rather, the clear thrust of plaintiffs' claims against these defendants is the dram shop act. Nevertheless, applying notice pleading principles [Rule 8, Ala.R. Civ.P. (and the committee comments thereto)], this Court believes the question of whether a common law negligence action will lie under the circumstances of this case also should be addressed."